## TOMPKINS et al. v. LEARY.

(Supreme Court, Appellate Division, Second Department. October 8, 1909.)

1. EVIDENCE (§ 313*)—WEIGHT—EVIDENCE OF CONVERSATIONS.
As the correct narration of conversations is very difficult, the narration of a witness of his conversation with a person, since deceased, is esteemed in justice the weakest evidence.
[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1166, 1167; Dec. Dig. § 313;* Gifts, Cent. Dig. § 96.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. WITNESSES (§ 311*)—WEIGHT OF EVIDENCE—CHARACTER OF WITNESS.

Where the accuracy of a witness' memory is under discussion, the ordinary tests of trustworthiness of memory, in view of the circumstances, must be applied, and no argument can be based on the elevated character of the witness.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 1072; Dec. Dig. § 311.*]

3. GIFTS (§ 49*)—INTER VIVOS—EVIDENCE—WEIGHT.

The rule that a gift is not presumed, but must be established by clear, convincing, and satisfactory evidence, applies to gifts inter vivos.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. § 95; Dec. Dig. § 49.*]

4. GIFTS (§ 49*)—INTER VIVOS—EVIDENCE—WEIGHT.

Evidence *held* not sufficiently clear, convincing, and satisfactory to establish a gift inter vivos.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. §§ 95–100; Dec. Dig. § 49.*]

5. GIFTS (§ 49*)—INTER VIVOS—DELIVERY.

Unless the facts are clearly proved and uncontradicted, so as to point to an uncontradicted conclusion, the question of delivery essential to a gift inter vivos is for the jury.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. § 97; Dec. Dig. § 49.*]

6. GIFTS (§ 22*)—INTER VIVOS—DELIVERY.

A delivery essential to constitute a gift inter vivos may be symbolical, as by the delivery of a key to the receptacle of the gift, only where the conditions are so adverse to actual delivery as to make the symbolic delivery as nearly perfect and complete as is possible.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. § 37; Dec. Dig. § 22.*]

7. GIFTS (§ 22*)—INTER VIVOS—DELIVERY.

Where the testimony to establish a gift inter vivos of securities showed that the donor picked up a key from a number which he had, and said to the donee that the key was the key of his desk, and that the donee should unlock the top of it and that he would find securities there, but failed to show any good reason why the donor could not have had the securities brought to him and made a delivery of them, there was a failure to show a reason for symbolic delivery, and the gift failed for want of delivery.

[Ed. Note.—For other cases, see Gifts, Cent. Dig. § 37; Dec. Dig. § 22.*]

Appeal from Trial Term, Westchester County.

Action by Daniel D. Tompkins and another against Thomas Leary. From a judgment for plaintiffs, and from an order denying a new trial, defendant appeals. Reversed, and new trial granted.

Argued before HIRSCHBERG, P. J., and JENKS, GAYNOR, RICH, and MILLER, JJ.

Louis Marshall (Abraham Benedict, on the brief), for appellant.
Smith Lent, for respondents.

JENKS, J. The defendant appeals from a judgment on a verdict at Trial Term for the plaintiffs, and from an order denying a new trial on the minutes. The action is to recover securities valued at $13,710 as a gift inter vivos made by Cartwright to the plaintiffs. The defendant is the sole surviving executor of Cartwright, but is sued personally. He makes general denial.

The plaintiffs' case rests mainly upon the testimony of Johnson, a servant in Cartwright's house for 12 years. On July 20, 1906, Cart-

wright, aged 84 years, ill in his home, was about to be taken on that day to the hospital for a desperate operation. Johnson testifies that about 8 a. m. he and the plaintiff D. Tompkins were alone with Cartwright, who picked up a key from a number which he had in his hand and said to Tompkins, "Dan, this is the key of my desk down in my office, and you unlock the top of my desk, and you will find some money there and securities· of considerable value," and that thereupon Cartwright handed the keys to Tompkins, saying, "Take my keys." Tompkins said, "What will I do with those securities, Uncle George?" and Cartwright answered: "Keep them for you and your wife, you and Mary." The witness then said to Tompkins:

"'Ask him how about running the house while he is gone to the hospital,' because [says the witness] he wanted me to stay there, and Cartwright said· 'Let Richard and Lucy [i. e., Johnson and another servant] buy the necessary food to suit themselves, and you see that the bills are paid.'"

The witness testifies that in a very few minutes the ambulance came and took Cartwright away. Cartwright died in the hospital the next day.

Circumstances which may make for the plaintiffs are that Cartwright was the godfather of Tompkins' wife; that the Tompkinses lived in the same town; that they appear to have been frequent and intimate visitors in Cartwright's home; and that Cartwright had no near relatives, and mentioned none nearer than first and second cousins. in his will. And plaintiffs' witness Ellegood testifies that Cartwright had said to him that Cartwright's sister had given once a deed of a house to Mrs. Tompkins, but had withdrawn it and then remarked:

"'Now, I cannot understand why Libby didn't make some provision for Mary.' Mary is a namesake of the family, and had always been regarded almost like one of their own children. 'I will have to see what I can do to make it up for her.'"

On the other hand, Cartwright had made a will eight months before, whereby he devised certain pieces of realty to a church and a hospital, respectively, 100 shares of stock to two cousins respectively, $11,000 each to four second cousins, and $2,000 to a Miss Swain. He also gave to Mary Tompkins and her husband (these plaintiffs) his house and land wherein he resided, with the furniture thereof, for their lives, and then to their son. He gave legacies to two churches and made some small specific bequests. The said house and land given to these plaintiffs were worth about $8,000, exclusive of the contents thereof. The total estate was about $104,000. After deduction for the church of $20,000, for the hospital of $15,000, for St. Matthews Church of $1,000, for Star of Bethlehem Church of $1,000, and of $8,000 for the house left to the plaintiffs, the balance of the estate was $35,000, including the securities in suit. The total pecuniary legacies were $46,000, leaving a deficiency of $10,000, subject to the determination whether a legacy had lapsed which would leave the deficiency about $700. If the securities in suit were taken out, there would be a shortage of $13,000 or $14,000. This proof is pertinent to show that the testator did make a provision for Mary—a house—which could be said to make up for the house taken from her; that the provision was probably as large as that made for any other individual; and that,

if the securities sued for are excluded from the scope of the will, such exclusion would seriously disturb the specific provisions thereof. No reason is suggested why such exclusion should have been made.

Johnson is confronted by a witness, Mrs. Rosa Coutant, a professional nurse, who was in charge of Cartwright, and who had been an inmate of his house for a long time. Her testimony may be summarized as follows: She was in attendance upon Cartwright on that day until she went with him to the hospital. The plaintiff D. Tompkins came into Cartwright's room at 8:30 a. m., when she was alone with Cartwright. Johnson had gone to order a carriage to take her to the hospital. She gave a fan to Tompkins to take her place in fanning Cartwright. As she was about to fetch her bag from her room, she noticed Cartwright's watch on a bureau, and said to him:

"'Here is your watch. What do you want to do with it?' And he says: 'Well, I will take it with me.' She said: 'If you take the watch, they will take it from you at the hospital.' He said: 'Well, then, I won't take the watch.'"

Then he held it up with his hand and said: "Danny Tompkins, I will give you this watch and chain." Then, as the witness turned to him, she saw his keys on the bureau. She picked them up, and said to Cartwright, "What do you want done with your keys?" He took them up in his hand—

"and he fumbled them a little while. He stopped and paused, and he says, he handed them to Danny Tompkins, and he said, 'I will give you these keys to keep while I am gone, and I will give you full charge of the house while I am gone.' And then he said, 'Danny, there is quite a good deal of money in my desk, and there is bonds and mortgages or stocks and mortgages in my desk.' Also he says: 'Take good care of them.' He commenced to tell them what he had done for Mr. Tompkins' son, he says: 'I have given your son Danny this house and lot, but I have given you and your wife, Mary, the use of this as long as you live.'"

The witness then stepped out of the room to get her bag, and Cartwright continued in this strain, telling what he had done, and the witness testifies, "But I could hear everything." The bag was on the edge of the witness' room outside the door, and the witness did not go out of hearing. She testifies that, as she started back, she saw the doctor and Johnson and Ellegood coming up the stairs, and thereupon Cartwright was brought down. She testifies that Johnson was not present at the conversation, that "all he heard of it was while he was coming up the stairs, just as he came in the room there with the other people. He was not present." She positively denies that Cartwright said in her hearing in words or substance that the securities were for the plaintiffs. She testifies that D. Tompkins said, "Thank you, Uncle George," after Cartwright had told him of the provision made in his will.

It does not follow that either Johnson or Mrs. Coutant is a deliberate perjurer. Moore on Facts quotes the observation of Manning, J., in Piffet's Succession, 37 La. Ann. 871–873:

"The narration of conversations correctly is the most difficult feat of memory and of expression, and of all evidence the narration of a witness of his conversation with a dead person is esteemed in justice the weakest."

See, too, McKinney's Administratrix v. Slack, 19 N. J. Eq. 164.

The effect of the variance between them is whether Cartwright by his conversation intended to give the key to Tompkins to take charge of the property in the desk while Cartwright was absent in the hospital, or whether Cartwright sought to give the securities to D. Tompkins and his wife. Johnson on cross-examination testified that Mrs. Coutant, about to go to the hospital, put on her "coat and furs and hat," but when his attention was called to the statement, he said, "She didn't put on her furs. She put on her shawl, something to wrap around her." Pressed, he said it was a light shawl, he thought, and he was not sure about the hat. This was July 20th, and the evidence is that Cartwright was fanned at the time. Mrs. Coutant testifies that she did not even put on a hat. This may seem trivial, but it is to be remembered that it is by such trivialities that testimony is often tested. Again, Johnson was asked whether he told Mr. Larkin (the defendant's attorney) that Cartwright had said that these securities were for Tompkins and his wife "when the breath leaves my body," and he answered:

"No, sir; I didn't state that.

"Q. Did you use that expression at all as coming from Cartwright, when you were talking with Mr. Larkin? A. No, sir; I didn't bring it in any way.

"Q. Did you use it at all? A. Yes, sir; I did, but Mr. Cartwright didn't say that to me.

"Q. Did you tell Mr. Larkin that Mr. Cartwright had said that to Tompkins? A. No, sir.

"Q. That they should have these things 'when the breath leaves my body'? A. No, sir; I didn't say that. I didn't tell that to Mr. Larkin."

Mr. Larkin testifies thereafter:

"Q. Did Johnson at that time say to you as to this conversation that he said he had overheard between Mr. Cartwright and Mr. Tompkins July 20, 1906, this: 'Mr. Cartwright selected a key on a bunch of keys, and said to Mr. Tompkins, "Here is the key to my desk." Tompkins said: "Uncle George, what shall I do with it?" And Mr. Cartwright said: "There is some money in the top part of the desk, and there are some securities of considerable value in it." Tompkins said: "Who are they for?" Mr. Cartwright said: "They are for you and Mary or your wife, and everything in the house belongs to you and her when the breath leaves my body." ' A. That is my recollection of the conversation had with Mr. Johnson in my office. I made this memorandum of that conversation within five minutes after he left the office or after he had made the statement."

I do not mean to say that Mrs. Coutant passed unscathed under the cross-examination. She was attacked vigorously, on the ground that she had profited as the nurse of Cartwright's sister by gifts from that sister, and that she had filed a large claim for services which had been reduced by the surrogate, and that she had included in her alleged term of service certain weeks when she was elsewhere. Johnson and a maid in the house testified that Mrs. Coutant had proposed to them that they should all file large claims, but this she denies. On the other hand, it appears that Johnson now works for the plaintiff; that he, too, although a servant in the house, filed a claim against the estate for $200 as night watchman. Mr. Tompkins' conduct subsequent to the alleged gift at least cannot be said to make for his contention that there was such gift of these securities perforce of the conversation narrated by Johnson. If he considered that he therefore owned the

securities, and if he was in possession of them—that is, with the key to the desk—he could readily have taken them into possession after Cartwright left the house, for upon his theory the gift was then complete. He testifies that he asked the defendant to the house on July 20th as "an adviser," not knowing him to be an executor; that he then unlocked the desk and looked over the contents in a casual way; that they then knew that there were securities and mortgages in the desk. He testifies that he told the defendant that the house belonged to them, and asked him if they should take the securities out of the house, but that defendant said, "No; I would leave them there." He testifies that in a few days thereafter the defendant and he were in the house with the will; that defendant read the will with the witness looking over his shoulder; that the eighth paragraph was called to his attention, and he said: •

"Well, it is coming to us any way by the will. I meant what I had already told him, the securities in the desk, the property in dispute. Mr. Leary [the defendant] didn't say anything. He didn't know."

Tompkins also testified that shortly thereafter Mr. Leary and Mr. Gibney, the other executor (who is dead), came to the house, went through the desk, picked up the things, and among them the deeds in the desk and these securities, whereupon he said:

"Now, I will let you have these if you will promise that whatever is right for me—to return them to me. Mr. Leary said: 'Why, certainly, I haven't anything in this. Whatever belongs to you you shall have.' * * * And I let him have them with that understanding."

Mr. Leary testifies that he has no recollection of the interview of July 20th, and testifies that he was certain he was not there, that he made memoranda of his visits, and, further, that he never had any conversation with Tompkins "as an adviser," that he never looked over any papers in Cartwright's desk with Tompkins prior to the time of his taking possession. He testifies that he has no recollection of any such statement testified to by Tompkins as made to him and Mr. Gibney, or of any claim of ownership made except "by the paper served on him." There is evidence that at the reading of the will in the presence of the plaintiffs no claim to these securities was asserted. It is undisputed that Tompkins was present when the inventory was made by the appraiser, and asserted no claim whatever to any of the securities now sued for. The first demand, therefore, was made about 11 months after the alleged gift; and this action was brought two years thereafter. There is reason for the conclusion that D. Tompkins considered that the securities belonged to him under the will because they were in the desk in this house which was left to him and to his wife. Seth G. Ellegood, a witness called by the defendant, testifies:

"I remember having an interview with Mr. Tompkins a few days after the reading of the will, at the First National Bank, Ossining. That is Mr. Tompkins' Bank.

"Q. What did he say at that time? A. He said he thought that all those securities whatever there was in the desk there belonged to him under Mr. Cartwright's will, and I think now that he also made the assertion that he had given him the keys, which showed that he meant him to have them, or something to that effect.

"Q. In this statement, you didn't say anything about Tompkins having said

that Cartwright had given him the keys? A. No; I remember now, though, that he said something about having had the keys to the desk, but he said he was going to claim those securities under that clause of the will."

There is no dispute as to the character and standing of D. Tompkins. Moore on Facts says:

"Consequently, if the validity of a witness' memory is under discussion, no argument based upon the elevated character of the witness should have the slightest weight in his favor. Ordinary tests of trustworthiness of memory, in view of the circumstances of the case, must be unflinchingly applied. His testimony must be weighed as if he were unknown, and it is not entitled to a whit more of consideration than is justified by its own intrinsic force connected with the other circumstances of the case"—citing authorities.

The act of delivering the keys or the key was ambiguous. It cannot make for the plaintiffs as against the defendant, for it is consistent with leaving a close friend in charge of the house during an absence. It cannot be said that the gift was an entirely natural act under the circumstances of the relations of the plaintiffs and the decedent because Cartwright had made a substantial provision for the plaintiffs and their son under his will. There is no surrounding fact which makes cogently for the plaintiffs. The case ultimately turns, then, on the testimony of Johnson. In view of it, it cannot be said that it presents the clear, convincing, and cogent proof that is required in such cases. A gift is not presumed. Matter of Bolin, 136 N. Y. 177–180, 32 N. E. 626; Devlin v. Greenwich Savings Bank, 125 N. Y. 756, 26 N. E. 744. It must be established by evidence that is "clear and convincing, strong and satisfactory," by evidence which is "very plain and satisfactory." Devlin v. Greenwich Savings Bank, supra; Ridden v. Thrall, 125 N. Y. 572–576, 26 N. E. 627, 11 L. R. A. 684, 21 Am. St. Rep. 758; Bray v. O'Rourke, 89 App. Div. 400, 85 N. Y. Supp. 907; Scoville v. Post, 3 Edw. Ch. 204; Grymes v. Hone, 49 N. Y. 17, 10 Am. Rep. 313. This rule applies to gifts inter vivos. Bray v. O'Rourke, supra, and authorities cited. Unless the facts are clearly proved and uncontradicted, so as to point to an uncontroverted conclusion, the question of delivery is for the jury. Thornton on Gifts, p. 186. I have serious doubt, however, whether the facts are sufficient to justify the verdict in this case. Of course, a delivery may be symbolical, and the tradition of a key to a receptacle of the gift may be sufficient delivery, but such an act is not a satisfaction of the rule, but in derogation of it, and it is sufficient only when the conditions were so adverse to actual delivery as to make the symbolic delivery as nearly perfect and complete as is possible. Some of the cases hold that such conditions contemplate the nature of the gift and the location of it, but Thornton on Gifts says:

"The rule, we think, has been greatly modified by the more modern decisions on the subject. It is that the delivery must be according to the nature of the thing, and usually that means according to the physical nature of the thing to be delivered, such as the bulk or weight, and does not refer to the locality of the thing."

However, it is unnecessary to discuss the situation of the securities in this case, for admittedly these were in a desk in the house. No good reason appears in this record why the alleged donor could not have had

the securities brought to him forthwith, and then and there have made a delivery of them, and hence there is no reason why a symbolical delivery should suffice in this case. There is great force in the utterance of Dixon, J., for the court, in Keepers v. Fidelity Title & Deposit Co., 56 N. J. Law, 302, 28 Atl. 585, in New Jersey Court of Errors and Appeals, 23 L. R. A. 184, 186, 44 Am. St. Rep. 397, where the question presented was as to the symbolic delivery by key:

"We agree with the sentiment expressed in Ridden v. Thrall, 125 N. Y. 572, 26 N. E. 627, 11 L. R. A. 684, 21 Am. St. Rep. 758, that 'public policy requires that the laws regulating gifts causa mortis should not be extended, and that the range of such gifts should not be enlarged.' When it is remembered that these gifts come into question only after death has closed the lips of the donor, that there is no legal limit to the amount which may be disposed of by means of them, that millions of dollars' worth of property is locked up in vaults, the keys of which are carried in the owners' pockets, and that, under the rule applied in those cases, such wealth may be transferred from the dying owner to his attendant, provided the latter will take the key, and swear that it was delivered to him by the deceased for the purpose of giving him the contents of the vault—the dangerous character of the rule becomes conspicuous. Around every other disposition of the property of the dead the legislative power has thrown safeguards against fraud and perjury. Around this mode, the requirement of actual delivery is the only substantial protection, and the court should not weaken it by permitting the substitution of convenient and easily proven devices."

The judgment and order must be reversed and a new trial must be granted, costs to abide the event. All concur.