THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* GEORGE GRAHAM RICE, Also Known as JACOB S. HERZIG, and Others, Respondents, Impleaded with FRANK J. SILVA, Defendant.

First Department, July 15, 1927.

Corporations — stock — action under General Business Law, art. 23-A, founded on §§ 352, 353, to restrain defendants from engaging in sale of corporate stock — evidence shows one defendant had option on large part of stock of mining corporation — evidence shows " wash " sales on Boston Curb to raise price and other fraudulent acts — representations concerning mine were false — error to strike out certain of plaintiff's exhibits.

This is an action brought by the Attorney-General under article 23-A of the General Business Law, founded on sections 352 and 353 of the General Business Law, to restrain the defendants from engaging in certain fraudulent practices in the sale of corporate stock in the State of New York. The evidence shows that one of the defendants acquired an option on nearly all of the capital stock of a mining corporation at ten cents per share; that said defendant was the owner of the corporation defendant, which published a trade paper and he caused to be inserted in said paper, as news items, false accounts of the value of the corporate stock and of the assets of the corporation; that said defendant, acting through dummies, entered into a fraudulent scheme whereby " wash " sales were recorded as genuine purchases and sales on the Boston Curb Market and published as such; that the prices received from said sales were fixed by said defendant in furtherance of the scheme to sell the stock to the public; that the property owned by the mining corporation had little, if any, real value; and that the statements printed in the paper published by the corporation defendant were false. Said defendant took up his option on the corporate stock and disposed of the stock to the public at prices ranging from fifty to ninety cents per share between March and July, 1925. The evidence establishes that the defendants were engaged in illegal practices in violation of the General Business Law, and should have been restrained.

It was error for the court to strike out an exhibit which was a transcript of books showing the fictitious transactions in the stock, which transcript constituted a part of the deposition of a witness.

It was error to strike out an exhibit which was a transcript of books showing fictitious transactions, on the ground that it was not the best evidence, in

that the original books were not accounted for. The evidence shows that the original books were lost or destroyed, and the owner testified to the correctness of the transactions that were found in the transcript. Under the circumstances, secondary evidence was admissible.

It was error for the court to strike out an exhibit which was a transcript taken from the books of a broker, residing in Boston, which showed fictitious transactions in the stock in question, for, under rule 130 of the Rules of Civil Practice, the owner of the books not being willing that they should leave his possession, it was proper to take a transcript thereof for the purpose of introducing the same in evidence, under the limitations prescribed by rule 130.

APPEAL by the plaintiff, The People of the State of New York, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 30th day of March, 1927, upon the decision of the court rendered after a trial at the New York Special Term.

This action was brought by the Attorney-General under article 23-A of the General Business Law for an injunction restraining the defendants from engaging in certain fraudulent practices in the sale of securities in the State of New York.

*Keyes Winter* of counsel [*William H. Milholland* with him on the brief; *Albert Ottinger, Attorney-General*], for the appellant.

*Louis Marshall* of counsel [*Henry A. Wise, Charles S. Whitman, Nash Rockwood* and *James Marshall* with him on the brief], for the respondents.

MARTIN, J. The complaint alleges that the defendants by means of a fraudulent scheme were attempting to sell certain stock. This action, brought for the purpose of preventing such practices, is founded upon sections 352 and 353 of the General Business Law (added by Laws of 1921, chap. 649, as amd. by Laws of 1925, chap. 239; since amd. by Laws of 1926, chap. 617; § 352 since amd. by Laws of 1927, chap. 365), which provide, in part, as follows:

" § 352. Investigation by Attorney-General. Whenever it shall appear to the Attorney-General, either upon complaint or otherwise, that in the advertisement, purchase or sale within this State for future delivery of any commodity dealt in on any exchange within the United States of America or the delivery of which is contemplated by transfer, * * * or that in the issuance, sale, promotion, negotiation, advertisement or distribution within this State, of any stocks, bonds, notes, * * * or other securities * * * any person, partnership, corporation, company, trust or association shall have employed, or employs, or is about to employ any device, scheme or artifice to defraud or for obtaining money or property by means

of any false pretense, representation or promise  *  *  *  or he believes it to be in the public interest that an investigation be made, he may in his discretion either require or permit such person, partnership, corporation, company, trust or association to file with him a statement in writing under oath or otherwise as to all the facts and circumstances concerning the subject matter which he believes it is to the public interest to investigate,  *  *  *.

"§ 353. Action by Attorney-General.  *  *  *  he may bring an action in the name and on behalf of the People of the State of New York against such person  *  *  *  to enjoin such person  *  *  *  from continuing such fraudulent practices or engaging therein or doing any act or acts in furtherance thereof.  *  *  * "

It is alleged that the defendants George Graham Rice, also known as Jacob S. Herzig, the Wall Street Iconoclast, Inc., Rose McKernan, and Frank J. Silva, who was not served with process and did not appear, between the 1st day of January, 1925, and the 7th day of January, 1926, within the State of New York and elsewhere, jointly and severally were and are now engaged in the issuance, sale, purchase, promotion, negotiation, advertising and distribution of stocks, bonds and other securities within the meaning of and in violation of article 23-A of the General Business Law of the State of New York.

The complaint then proceeds to give in detail the methods employed and sets forth that these defendants are now and were engaged in the selling, purchasing and promoting, advertising and distributing of stocks; that the defendants owned or procured an option to purchase 1,200,000 shares of the capital stock of the Idaho Copper Corporation at from ten cents to thirty cents per share, and employed certain brokers in the city of Boston to sell the shares; that the defendants entered into a fraudulent scheme whereby " wash " sales were recorded as genuine purchases and sales and reported and published as such.

We do not agree with the respondents that the complaint contains nothing more than a few conclusions. It contains allegations of fact constituting the fraud. In addition a most minute bill of particulars was served giving the sales and showing that they were what are commonly known as " wash " sales.

The total authorized capital stock of the Idaho Copper Corporation is 2,500,000 shares of the par value of one dollar per share. That company owned three mining claims and had no other assets. The stock was listed March 14, 1925, on the Boston Curb Exchange in the name of Rice's dummy, a man named Silva.

The defendant Rice received an option to purchase 1,825,000

First Department, July, 1927.     [Vol. 221

shares of this stock at a low price, tying up in escrow 615,000 additional shares and leaving 60,000 shares in the hands of the public. The provisions of the contract provided that the stock was to net the corporation a maximum of $129,000.

Eighteen issues of the *Wall Street Iconoclast,* the defendant Rice's paper, are in evidence. They are not printed in the record, but were handed to the court. Beginning with the issue of March 24, 1925, they show Rice, posing as editor, advising subscribers to purchase this stock. Concealing his own interest he is endeavoring to inspire the confidence of the public in his " advice." What are actually advertisements are arranged in columnar form as news items, with screaming headlines. There are pages of " advice to investors " in the form of letters and answers, including " advice " and " news " about Stock Exchange securities in which Rice has no interest. To impress the public with his honesty, he had printed a slogan in large type over the front of his paper reading: " The truth no matter whom it helps or hurts." He attacks Wall Street " margineers; " and in general dresses up the paper as an impartial and fearless critic and adviser.

Practically all of this stock sold to the public through different people on the Boston Curb Exchange at prices ranging from fifty cents to ninety cents, was owned by Rice and had been bought by him at ten cents per share under the option mentioned.

The law governing this subject has been well stated in *Ridgely* v. *Keene* (134 App. Div. 647): " The plaintiff by newspaper advertisements and circular letters sought to influence people to subscribe for his daily market letter, wherein he undertook to furnish them exact and detailed information and to give them impartial and unbiased advice respecting stock market matters, of which he assumed to possess superior knowledge and means of information. His daily letters to subscribers contained the following statement:

" ' No " Discretionary account " business done. And no connection whatever with any brokerage office.'

" The defendants were stockbrokers. They were interested in a pool in Southern Pacific stock, and, according to the plaintiff's testimony, they wished to create a rising market for that stock, to ' bull it,' as the expression is, and the plaintiff has recovered a judgment on a contract to assist them in doing that by inducing the purchase of stock by subscribers to whom he pretended to give unbiased advice.

" *One's sense of right and wrong is a safe guide as to what constitutes decent, honorable conduct, and it hardly seems necessary to*

*analyze the transaction in suit or to quote precedent to show that the plaintiff is seeking to recover the fruits of an illegal and immoral contract.* The relation between the plaintiff and his subscribers was one of confidence and trust. He calls them his ' clients,' his ' clientele,' his ' following.' He expected them to act upon his advice in the purchase and sale of stock, and, even had there been no express representations made by him, there would have been an implied obligation on his part not to receive pay from third parties for advising them in a particular way. He seeks to excuse his conduct by asserting that the defendants represented, and that he honestly believed, that his subscribers would profit by his advice; but his belief in the soundness of his advice is wholly immaterial. The law takes into account human frailty, and absolutely forbids the assumption of conflicting obligations and duties and refuses to inquire whether the persons assuming inconsistent relations really supposed he was faithful to both.   *   *   *   The law does not suffer one to undertake thus to keep good faith or to assume duties with which selfish interest may conflict.

" *In a nutshell, the plaintiff has recovered upon a contract to perpetrate to fraud upon his subscribers, for there can be no doubt that what the .agreement contemplated and what the plaintiff actually did was a palpable fraud upon them.* It was a violation of his implied obligations as well as of express representations made to them. The contract was illegal and contrary to good morals, and hence the court refuses him its aid."

In *People* v. *Federated Radio Corporation* (244 N. Y. 33) the court said: " While certain practices are declared by the act to be fraudulent the definition of a fraudulent practice goes no further than to say that a fraud or a violation of law which would operate as a fraud is a fraudulent practice which may be enjoined, and we must gather from other sources the meaning of the word ' fraud.' In a broad sense the term includes all deceitful practices contrary to the plain rules of common honesty.

" The purpose of the law is to prevent all kinds of fraud in connection with the sale of securities and commodities and to defeat all unsubstantial and visionary schemes in relation thereto whereby the public is fraudulently exploited. (*Hall* v. *Geiger-Jones Co.*, 242 U. S. 539.) The words ' fraud ' and ' fraudulent practice ' in this connection should, therefore, be given a wide meaning so as to include all acts, although not originating in any actual evil design or contrivance to perpetrate fraud or injury upon others, which do by their tendency to deceive or mislead the purchasing public come within the purpose of the law."

And at page 40: " It is practically assumed both on the briefs and by the questions certified to this court that if the statute is directed against all kinds of fraud, facts are sufficiently set forth in the complaint to bring the case under the statute.    The allegations are in effect that the advertising matter of the defendants, contained in a promoters' prospectus, unduly inflates the value of the stock and conceals certain facts in regard to such values which should in good faith be revealed.    The complaint charges specifically that the sale of the stock operates as a fraud on the public within the meaning and intent and in violation of the statute and is within the provisions of the statute.    The Penal Law condemns as a fraudulent practice the flotation of worthless securities by untrue, deceptive or misleading advertising.    If the intent of the defendants in engaging in the practices complained of is to sell securities which are in fact worthless or worth substantially less than the asking price, intentional misstatements, as in an action at law to recover damages for fraud and deceit (*Reno* v. *Bull*, 226 N. Y. 546), need not be alleged.    Material misrepresentations intended to influence the bargain, on which an action might be maintained in equity to rescind a consummated transaction, are enough.    (*Bloomquist* v. *Farson*, 222 N. Y. 375.)    Promoters are under a duty to make reasonable investigation before issuing a prospectus and to the extent that they fail in the performance of their duty, lack of scienter will not relieve them from liability in actions brought under the Martin Act.    *    *    * ''

The paper known as the *Wall Street Iconoclast* represented that the three mining claims owned by the Idaho Copper Corporation, known as the South Peacock, Wedge and Copper Key, were very valuable because the mines contained great quantities of ore. The issue dated March 24, 1925, contained the following:

" President Yorston reports officially that the net value of the ore down to the 200-foot level is $22,016,000, equal to $8.80 per share on the 2,500,000 shares of the company capitalization. Allowing for amortization, since it is officially stated that with the experimental mill facilities now projected, this tonnage is equal to more than thirty years' supply, we appraised the intrinsic value of the stock at $2½ a share    *    *    *.

" Again the big copper vein on this property has been diamond drilled on ground immediately adjoining to a depth of 1,200 feet, and found to be as rich and as wide at that point as already developed to the 200-foot level in the Idaho Copper Corporation's property.    *    *    *

" Ore body, 50 feet wide (the average is greater, and at a depth

of 1,200 feet the diamond drill indicates it to be 75 feet wide on the adjoining property).

" Depth of ore body 200 feet (it has already been opened up on our property to a depth of 300 feet, and the fan of drill holes on the adjoining property, a few hundred feet away, shows that it persists to a depth of 1,200 feet).    *    *    *

" An ore body that is 50 feet wide, 1,010 feet long, and 200 feet deep contains roughly 1,280,000 tons of ore, figuring 8 cubic feet to the ton, which is conservative for ore of this description.    *    *    *

" As a mine (the property of the Idaho Copper Corporation), it has by far the best showing of any in the district, and has produced the richest ore of any yet found.   The vein on it is the most regular and best defined in the whole district.    *    *    *

" I have in my possession authoritative statements from twenty-seven individual sources which are all cumulative on the point that the extensive showings of copper ores in the Seven Devils Mining District, and on the property of the Idaho Copper Corporation in particular, are the most remarkable from the standpoint of richness and extraordinary width of the main vein that have come to notice in many years."

The *Wall Street Iconoclast* of April 14, 1925, contained the following statement:

" Allowing for amortization, gives the stock an intrinsic value at this time of at least $2.50 a share.

" The big copper vein has been diamond drilled on ground immediately adjoining to a depth of 1,200 feet and found to be as rich and as wide at that point as down to the 200-foot level. The value of the ore body may, therefore, in time be multiplied sixteen times.    *    *    *

" There is not only no diminution in vein width and ore value at depth, but on the adjoining property a fan of drill holes, drilled to a depth of 1,200 feet indicated that the ore body at that depth probably widened out to 75 feet and to be of the same richness.

" These holes were put down for a distance of 1,000 feet along the strike of the vein within the confines of the adjoining Peacock claim alone, and at no place where the holes entered the wall did the ore body show any diminution.   The average showing was 8 per cent copper and $6.00 in gold and silver, across what was calculated to be approximately 75 feet of vein width.   The vein has been opened up by six distinct open cuts and shallow shafts on the surface of the South Peacock, Copper Key and Wedge claims of the Idaho Copper Corporation for a distance of 1,010

feet and is shown to persist in width and richness for this entire distance."

In the issue of April 7, 1925, we find the following:

" The big copper vein of this property has been diamond drilled on ground immediately adjoining to a depth of 1,200 feet and found to be as rich and as wide at that point as down to the 200-foot level.   *   *   *

" At the depth of 42 feet the cross cut is 53 feet long and shows the vein here to be 53 feet wide.   Assays show that for 22 feet of the width of the ore body, at this point, the average of the ore is better than 20 per cent copper and $3.00 per ton in gold and silver.

" At the 100-foot point, a cross cut has been driven which proves the width of the vein there to be $50\frac{1}{2}$ feet.   The rich ore on this level, on the foot wall, averages 49 per cent copper and $7.00 in gold and silver.   The average across the entire width of the vein, $50\frac{1}{2}$ feet, is 8 per cent copper.

" At the 200-foot point, a cross cut has been driven, which reveals the width of vein there to be 50 feet, with the values in the ore just as high as on the 100-foot level.

" At the 300-foot point, a cross cut was run to intersect the vein and proved the vein at that point to be 49 feet wide."

The uncontradicted evidence of the plaintiff's witnesses established that these representations were false.   Jay Czizek and Patrick L. Hughes, two disinterested witnesses having first-hand knowledge, gave testimony about these copper mines and their condition. The witness Czizek has been engaged in the mining business for forty-four years and had been the State Mining Inspector for the State of Idaho.   He was a practical mining man and had managed the mining operations which had been conducted in 1902 on these three mining claims of the Idaho Copper Corporation, the South Peacock, Wedge and Copper Key, the only property owned by that corporation.   He said he was engaged there in 1902; and that there was no ore of commercial quantity found in these mines. " We found nothing tangible, nothing to give any commercial quantities.   *   *   *   They are just chunks of pretty high-grade ore.   You find it occasionally in iron, and the vein, as I recollect it, was an iron and garnet vein."

The three mining claims owned by Rice's corporation were purchased by it in 1923 after the mines had remained idle since 1902.   Yorston secured the claims at a total cost of $14,500.

Rice states he bases his values upon the report of W. Bertrum Hancock.   It appears that Hughes had this report in his possession for years, and yet he sold the claims for $14,500.

Hughes also testified that it would take $250,000 to open up and develop the mining claims of the Idaho Copper Corporation. The record shows that all the money the Idaho Copper Corporation was to receive from its stock available for use in developing the properties, was $129,000, the amount received by the Idaho Copper Corporation for its stock sold to Rice at ten cents a share.

On March 24, 1925, the *Wall Street Iconoclast* contained the following statement: " Idaho Copper is now more promising from the standpoint of immediate market enchancement. · It has not been carried on margin and there is no pressure from this direction. The price being so low and the disparity between the market value and the analyzed value so great, it is steadily advancing. It moved up from 58 cents to 65 cents a share on the Boston Curb Exchange last week and closed yesterday at the top in a strong market for the stock. Boston brokers report that the highest class houses are represented on the buying side."

On March 31, 1925, the following important statement was made: " Two weeks ago, when first recommended for purchase by the Iconoclast, Idaho Copper was selling at 58 cents a share. When the last issue of the Iconoclast went to press it had risen to 65 cents. Yesterday it reached a new ' high ' on the movement of 74 cents, and closed buoyantly at the top."

The record establishes that the price of Idaho Copper Corporation stock was not fixed by any real demand or by competitive bidding; that the quotations were not due to public speculation but that they were absolutely dictated by the owner of the entire supply of this stock, the defendant George Graham Rice; and they were the result of manipulated sales and buying and selling among Rice's brokers for his account. Rice took up his option for the 1,825,000 shares of stock of the Idaho Copper Corporation at ten cents a share.

It is asserted for the defendant that every sale on the Boston Curb Market was a legitimate transaction, a commission having been paid in each instance. It is shown, however, that he secured the name of a dummy for the broker, and that the defendant Rice made many of these purchases himself through this broker under a fictitious name. This broker had arranged with another that, when Rice would give an order to sell, an order to buy would be put in through another dummy. When Rice gave an order· to buy, an order to sell would be forthcoming by arrangement. The scheme was to make it appear that there was a very active market in this stock, when in fact the market was made up of purchases and sales through the same man, George Graham Rice.

We have already pointed out that the stock of the Idaho Copper Corporation consisted of 2,500,000 shares of the par value of one dollar. The agreements dated March 14, 1925, defendant's Exhibits D, I and P, gave Frank W. Blair an option, assigned the same day to Rice's dummy Silva, at ten cents a share on 1,299,000 shares of treasury stock of the Idaho Copper Corporation for which the treasury was to be paid $129,000. By virtue of options a total of 2,440,000 shares were controlled or ultimately to be controlled by the defendant, leaving but 60,000 shares outstanding in the hands of the public.

The defendant Rice disposed of the stock to the public at prices ranging from fifty cents to ninety cents during the period running from March to July, 1925. This is established by the testimony of the People's witnesses Jarvis, Glynn, McAuliffe and Cronin, and by the entry of transactions in this stock that appear on their books of accounts, Exhibits 7, 8, 9 and 10.

Jarvis testified that he was hired by the defendant Rice to buy and sell the stock in large quantities from and to brokers on the Boston Curb Exchange; that from March 14, through July, 1925, the period covered by the complaint, his bookkeeper entered these transactions in their blotter from memoranda made at the time; that all these transactions were posted in one account in his ledger; that each day his bookkeeper, Joseph P. Glynn, made up a statement crediting Rice with the sales and charging him with the purchases; that this account was balanced and mailed to Rice with a check representing the difference between the amounts credited to him on sales and amounts charged to him on purchases, after deducting the commissions and stamps; that these statements also indicate the balance of shares of this stock due Jarvis on account of these transactions, this balance representing the difference between the number of certificates charged to Rice on account of sales and the number credited to him on account of purchases; and that following these statements they received from Rice certificates of stock to cover balances. In other words, they settled with Rice daily on the balances or differences as shown by these accounts.

Clearly Rice was engaged in a fraud sought to be carried out under the guise of apparently lawful transactions. The mines were not producing any commercial ore and were of no greater value under Rice than they had been under Hughes, who sold them for $14,500.

The trial court struck out plaintiff's Exhibits 7, 9 and 10, which

are of prime importance to plaintiff's case. The Attorney-General contends, and rightly, that these exhibits were properly admitted in evidence. They were shown to be correct transcripts of the entries in books upon which Rice and Jarvis made these settlements. They at least established a *prima facie* case of a large number of " wash " sales, fictitious transactions, purchases which exactly match and offset sales, one side of the stock account offsetting the other, and the result being to circulate certificates and checks from Jarvis to certain brokers and back again to Jarvis. The checks which passed from Jarvis to these brokers were returned to him the same day; and certificates that were delivered by Jarvis were also returned to him.

The entries also show that in addition to the large number of matched or crossed transactions, running as high as 20,000 shares a day, Jarvis made sales for Rice, at the prices fixed by these " wash " sales, of large amounts of stock to various other brokers who presumably were buying for the account of the public.

All this is made clear by a tabulation of one day's transactions taken from Rice's account in the books of Jarvis. On March 16, 1925, two days after Rice secured his option and the control of almost the entire capital stock, a number of transactions in Idaho Copper Corporation stock appeared on the books of Jarvis in Rice's account. These are as follows:

| Bought: | Sold: |
|---|---|
| 2000 shares at 56¢ from Joyce | 2000 shares at 56¢ to Joyce |
| 2000 shares at 56¢ from Driscoll | 2000 shares at 56¢ to Driscoll |
| 1000 shares at 56¢ from Darcey | 1000 shares at 56¢ to Darcey |
| 1000 shares at 56¢ from McAuliffe | 1000 shares at 56¢ to McAuliffe |
| 3500 shares at 56¢ from Crowell | 3500 shares at 56¢ to Crowell |
| 200 shares at 57¢ from Crowell | 200 shares at 57¢ to Crowell |

Genuine Sales:
100 shares at 57¢ to Grant
3000 shares at 57¢ to Joyce
100 shares at 57¢ to Crowell
1000 shares at 57¢ to Enos  .
1000 shares at 57¢ to Joyce
2000 shares at 57¢ to Joyce
2000 shares at 56¢ to Joyce

The sales and purchases shown by the exhibits were settled for by Rice, just as they were shown in the record; and he accepted the entries as correct.

Exhibit 7 was a transcript of the transactions of defendant's broker Jarvis with another member of the Boston Curb Exchange.

It showed the nature of defendant's purchases and sales in Idaho Copper Corporation stock and it also corroborated evidence as to Jarvis' dealings for the defendant.

Plaintiff's Exhibit 9 was a transcript of the books of the broker Jarvis, showing transactions in stock of the Idaho Copper Corporation for the defendant Rice. It was part of the deposition of the witness Jenks taken on the investigation of this matter by the Attorney-General. The defendants obtained a copy of this deposition, and with Jarvis and his bookkeeper, Glynn, compared the transcript with Jarvis' books. They then took the pages of Jarvis' blotter and ledger to the witness Jenks, the auditor for the Department of Public Utilities of the State of Massachusetts, and called his attention to the fact that there had been several errors in the transcript as copied in Jenks' depositions. Jenks compared the transcript with his original pencil transcript of the books of Jarvis. This was done in the presence of the defendants' attorney, the broker Jarvis and another lawyer representing the defendants. The transcript was found to be correct, excepting that there was one transposition. This indicated Sego was buying and the Wall Street Iconoclast, Inc., was selling, when it should have been Sego selling and the Wall Street Iconoclast, Inc., buying. There was also one other correction which was immaterial. The Attorney-General's stenographer had written the name F. J. Silva instead of F. J. Sego.

It was proved, therefore, that these transactions were correct, they having been compared and an error appearing in one instance having been corrected.

The court struck out Exhibits 9 and 10 on the ground that they were not the best evidence and that the original books of Jarvis were not accounted for. It was shown that the original books of Jarvis were lost or destroyed. Jarvis himself testified that some of them were destroyed when a fire occurred in the Curb Market and the rest lost in moving. He also testified to the correctness of the transactions that had been found in these transcripts taken by Jenks of the Public Utilities Department, testifying that he had searched for the books but could nowhere find them. Glynn, the bookkeeper for Jarvis, testified that he did not know where his blotter or ledger was. " I understand," he said, " it was lost at the time the Curb Exchange was burned. * * * Q. It is not in your possession anyway? A. It is not." He said he looked for them and could not find them. " Q. I understood you to say that these books, this blotter, check book, cash book, ledger, have all disappeared? A. No, the blotters and ledgers and checks. I found the stub of the check book. I found that in looking around.

\* \* \*  Q. Did you find your blotters?  A. No.  Q. Find your ledgers?  A. No.  Q. Where did you look for them?  A. All over the office, through my safes where I keep my books."

There having been proof that the original books had been lost or destroyed, and it also appearing that they could not be produced in the jurisdiction and were not subject to subpœna, secondary evidence of their contents was admissible.

Exhibit 10 was a copy of the broker McAuliffe's transactions in Idaho Copper Corporation with Jarvis.  McAuliffe testified as follows: " The witness — Yes; I wouldn't like to have my books go out of my possession, unless I could consult some attorney." This was when he was testifying in Boston.

Rule 130 of the Rules of Civil Practice provides: " If an exhibit be produced and proved, he shall annex to the deposition the exhibit, or a copy thereof if the original be not surrendered, subscribed by the witness proving it, and numbered or otherwise identified, in writing thereon, by the officer or person taking the deposition, who must subscribe his name thereto."

McAuliffe's testimony was that these papers were correct transcripts of his books and that they recorded all his transactions.

Jarvis testified that his books correctly recorded all his transactions.

The Attorney-General points out that the correctness of the books of Jarvis is shown by the correctness of the books of the broker McAuliffe, who testified that he had transactions with Jarvis and that he kept correct records of all his transactions, plaintiff's Exhibit 7 being a correct copy of his books.

The court erred in directing judgment for the defendant.  The judgment should, therefore, be reversed and a new trial ordered, with costs to the appellant to abide the event.

Dowling, P. J., Merrell, McAvoy and O'Malley, JJ., concur.

Judgment reversed and new trial ordered, with costs to the appellant to abide the event.  Settle order on notice.