## UNITED STATES v. BROWN et al.

District Court, S. D. New York.
Nov. 23, 1933.

82

George Z. Medalie, U. S. Atty., of New York City (Jacob J. Rosenblum, Joseph F. Finnegan, and William B. Herlands, all of New York City, of counsel), for the United States.

Samuel S. Koenig and Raphael P. Koenig, both of New York City, for defendant Brown.

William Goldman and Vincent Leibell, both of New York City, for defendant McCarthy.

William E. Butler, of Brooklyn, N. Y., for defendant Ross.

Harold Budner, of New York City, for defendant Petree.

Eugene Garey, of New York City, for defendant Woram.

WOOLSEY, District Judge.

The demurrer herein is in all respects overruled, and the motion to quash is in all respects denied.

I. The defendants above named were indicted on October 3, 1930, on nine counts for substantive offenses under United States Criminal Code, § 215, title 18 United States Code, § 338 (18 USCA § 338), for using the mails in furtherance of, or in connection with, a scheme to defraud, and on a tenth count under United States Criminal Code, § 37, title 18 United States Code, § 88 (18 USCA § 88), for a conspiracy so to do.

After pleading not guilty to the indictment, the defendants were allowed to withdraw their pleas and to file demurrers, or make motions, to the indictment in order that the interesting question of law here involved could be tested in limine and a long trial avoided if the court should feel that the indictment did not state a crime.

II. The indictment is in the usual form of mail fraud indictments, but the scheme to defraud which is set forth in it is novel and involves a question which seems to me of the highest importance.

It is stated in the indictment that on or about the 1st day of September, 1929, and continuously each and every day thereafter up to the date of the filing of the indictment, October 3, 1930, the defendants and another defendant named Howard Boulton, against whom a nolle prosequi has been entered, intentionally devised a scheme or artifice to defraud certain named persons and other persons described as a class, whom the defendants could induce, or cause to be induced, to purchase stock of the Manhattan Electrical

Supply Company—which I might here state, parenthetically, was then a listed stock on the New York Stock Exchange—by inducing them by means of false and fraudulent pretensions, representations, and promises, and by fraudulent artifices, devices, and acts, to part with their money and property in the purchase of shares of stock of the said Manhattan Electrical Supply Company at the market prices quoted therefor on the New York Stock Exchange.

It is alleged inter alia in the indictment, describing the scheme which is denounced thereby, that: "It was a part of said scheme and artifice to defraud that the defendants would form a pool or combination for the purpose of artificially manipulating the market in the stock of the said Manhattan Electrical Supply Company, Inc., so as to artificially advance and inflate the price thereof without regard to the real value of the stock from approximately twenty dollars per share to several times its then selling price, and with the intention of raising it from such prices so as to enable the defendants to sell to the said victims" (referring to certain persons named in the earlier part of the indictment as persons who had made purchases of the said stock) "and the public generally the shares of stock which the said defendants had acquired or were to acquire."

In further description of the scheme, it is alleged inter alia that it was a further part of said scheme that the defendants would dispose of part of their holdings in such stock as the stock increased in value; that they would arrange, by opening accounts with various brokers, for a control of the market by them by means of wash sales; and also that, in order to establish contact with possible victims, the defendants paid money to various publicity agents and customers' men and other employees of stock brokerage firms to— as the street phrase is—"tout" the stock, and engaged and paid a concern named W. J. Goldman & Co., Inc., to issue and circulate and distribute market letters, circulars, etc., among prospects to the number of 250,000 in an endeavor to induce the named victims and the public generally to become interested in, and to purchase, the stock of the Manhattan Electrical Supply Company, by making false and fraudulent representations and statements and promises as to the earnings of the Manhattan Electrical Supply Company, its probable future dividends, and as to certain allegedly advantageous contracts which it had made through one of its subsidiaries, and that the defendants knew these representations were and would be false and fraudulent, but made them in order to discourage and, if possible, prevent the persons who had bought the stock from selling it in competition with the pool by thus holding out the prospects that the stock would, on account of the advantages stated, reach a higher level than that at which it was purchased.

I think that the above is a fair summarized description of the nature of the scheme to defraud set forth in the indictment.

In each of the nine substantive counts, it is alleged, of course, that a letter was sent in furtherance of this scheme to the named persons.

And in the tenth or conspiracy count, the scheme to defraud is set forth almost in the same words in which it is set forth in the substantive counts, with the exception that there is a clerical error at the beginning of the conspiracy count, in that the conspiracy, instead of being dated from the 1st day of September, 1929, as is the scheme to defraud in the substantive counts, is dated from the 1st day of September, 1930.

Consequently the overt acts, of which there are eight alleged, all of them, except the fourth, are dated prior to the mistaken date given for the commencement of the conspiracy, and the fourth is given the date of the 13th of December, 1930, which was after the indictment was found, and therefore the fourth overt act would, of course, be outside the ambit of the conspiracy if correctly alleged, because that ends with the date of the indictment, though it might be available as a bit of evidence against the defendants participating therein. That will have to be later determined.

Defendants demurred to the indictment on the ground that the scheme to defraud is so vaguely and indefinitely alleged by reason of the reference to the inflation of the stock without regard to its "real value" as not to state a criminal offense, because the words "real value" are incapable of definite ascertainment, and the defendant Brown also takes the position that, in so far as the conspiracy count is concerned, it suffers from the same indefiniteness, and, consequently, that both the substantive counts and the conspiracy count are in violation of the Fifth Amendment.

The defendant McCarthy, in his motion to quash, broadens the attack because he claims that the indictment in describing the pool and its machinations does not state a crime under section 215 of the Criminal Code, title 18 United States Code, § 338 (18 USCA § 338) irrespective of the question of indefi-

niteness, though he also raises the point of indefiniteness in the same manner as does the demurrer of the defendant Brown.

The attorneys for the other defendants attended on the argument, but did not file any papers or participate therein.

III. The gist of the offense under United States Criminal Code, § 215, title 18 United States Code, § 338 (18 USCA § 338), set forth in the indictment, is the use of the United States mails to further a scheme and artifice to defraud or to obtain money or property by means of fraudulent pretensions, representations, and promises.

Because it is the gist of the crime, the use of mails is always set forth in detail in each count, as it is set forth in the indictment here, by stating the dates of the mailing of the several letters or circulars relied on to prove the consummation of the crime. But, as the scheme to defraud, while it is an ingredient of the crime, is not part of the gist thereof, it is sufficient to charge the scheme with such particularity as to enable the accused to know what he will be required to meet on the trial, and also to enable him to plead any judgment on the trial as a bar to further prosecution for the use of the mails in connection with the same scheme. Cf. Brady v. United States, 24 F.(2d) 399, 402 (C. C. A. 8); Cowl v. United States, 35 F.(2d) 794, 797 (C. C. A. 8).

I think that the scheme to defraud is set forth with adequate particularity in this indictment. The only question here is whether, as so set forth, it states a fraudulent scheme.

Defendant Brown's first attack is aimed at the third paragraph of the indictment, which, as usual, is incorporated by reference in all the other eight substantive counts. In that paragraph it is stated that the defendant's scheme to defraud was that the defendants would form a pool or combination for the purpose of artificially manipulating the stock of the Manhattan Electrical Supply Company so as to artificially advance and inflate the price thereof "without regard to the real value of the stock" from approximately $20 per share to several times its then selling price.

It is argued that the phrase above quoted, "without regard to the real value of the stock," is an essential part of the crime as alleged, and that, consequently, inasmuch as reference is made to real value, the indictment falls within the criticism voiced by the Supreme Court in the cases of International Harvester Co. v. Kentucky, 234 U. S. 216, 34 S. Ct. 853, 58 L. Ed. 1284; Collins v. Ken-

tucky, 234 U. S. 634, 34 S. Ct. 924, 58 L. Ed. 1510; and American Seeding Machine Company v. Kentucky, 236 U. S. 660, 35 S. Ct. 456, 59 L. Ed. 77͵, in which the statutes of Kentucky under which the indictments in those cases were lodged was held to be so vague in the criminal standard laid down as to contravene the due process clauses, as contained in the Fourteenth Amendment, and thus is applicable to a state statute; and United States v. L. Cohen Grocery Co., 255 U. S. 81, 41 S. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045, in which the Supreme Court laid down the same rule in respect of the effect of an act of Congress as contravening the due process clause of the Fifth Amendment which applies to congressional legislation.

The answer to this contention seems to me to be twofold:

First, it is answered by a construction of the paragraph under criticism, and in that construction I hold that, by a proper reading of that paragraph, the words "without regard to the real value of the stock" are really parenthetical and constitute merely an adverbial phrase—in effect equivalent to the use of some such adverb as "recklessly," "deceptively," "deceitfully," or "dishonestly." Consequently the phrase is not of the essence of the scheme described by the indictment, which, boiled down, denounced as a fraud the substitution of an artificially stimulated and controlled market for an appraisal of the stock in an open and free market, which is the basis of fair dealing in a securities market such as the Stock Exchange toward the persons who resort thereto for their purchases of securities. For a general discussion of this subject, see "Liability for Stock Market Manipulation" by A. A. Berle, 31 Columbia Law Review, 264.

The second answer to the defendant Brown's contention is that in the Supreme Court cases, cited above, the statute itself, which denounced the crime, involved the question of "real value" or "fair value," and, consequently, the proof of such real value or fair value was of the essence of the crime, whereas here the statute itself has no such vague standard. The difficulty here is not intrinsic in the definition of the crime or as it was in those cases, and, because the crime here, as above stated, is the use of the mails in furtherance of a scheme to defraud, it would not be necessary for the government, in order to prove its case, to prove what the real value of the Manhattan Electrical Supply Company's stock was. In the cases cited on behalf of the defendant, however, the real value

or the fair value had to be proved as part of the crime, and the Supreme Court said that involved too vague a standard by which to test criminality.

IV. Turning now to the broader ground of objection to the indictment, made in behalf of the defendant McCarthy; namely, that the indictment does not state a crime because a pool to raise the price of a security listed on an exchange is not a fraud, and hence that the scheme set forth in the indictment, which it is claimed turns on this point, is not fraudulent.

1. The theory pressed on me for the defendant McCarthy, as I understand it, is substantially this: That, if two or more persons, through the operation of what is known as a "pool," agree to raise the price of a security on a stock exchange, they may proceed to achieve that objective without being guilty of any actionable fraud, vis-à-vis a member of the public who purchases that security relying on the exchange market quotations, on the theory that the maxim of caveat emptor applies. But that maxim applies properly only to free and open markets.

When an outsider, a member of the public, reads the price quotations of a stock listed on an exchange, he is justified in supposing that the quoted price is an appraisal of the value of that stock due to a series of actual sales between various persons dealing at arm's length in a free and open market on the exchange, and so represents a true chancering of the market value of that stock thereon under the process of attrition due to supply operating against demand. Cf. North American Telegraph Company v. Northern Pacific Railway Company (C. C. A.) 254 F. 417, 418.

If, however, the market for the stock listed on an exchange is a manipulated or controlled market, in which a group of insiders, in order to enable themselves profitably to dispose of their holdings, are artificially raising the quoted price of the stock on the only market to which any man who wishes to purchase that stock would inevitably resort, and an outsider buys in that market he obviously pays more—how much more perhaps cannot be estimated and, in any event, in a criminal case of this kind, is not material—than he would have paid in a free and open market, and hence is a victim of unfair dealing by the insiders. But he is entitled to fair dealing and should get it. Wilson v. United States, 190 F. 427, 433, 434 (C. C. A. 2); Looker v. United States, 240 F. 932, 933-935 (C. C. A. 2).

The test of such fair dealing is the test to be applied in determining whether the scheme set forth in this indictment is fraudulent or not.

If it be contended, as I understand it is contended, that a man who buys a stock in hope of a rise and a chance to sell at an advance is speculating, my answer is that this matters not. For even a speculator is entitled not to have any present fact involving the subject-matter of his speculative purchase or the price thereof misrepresented by word or act.

As a result, a purchaser of a stock whose price is artificially raised by a pool is unfairly dealt with, for he has to pay more than he should pay for the stock, whether he be an investor or a speculator.

Judges have properly set their faces sternly against any practices by which the right of fair dealing between man and man is in any way infringed, and, whenever there is any false representation made by word or act in behalf of a pool for the purpose of inducing the public to come into the market and buy securities, it is held to be a fraud, and contracts between the insiders are held to be illegal and against public policy.

2. The doctrine stems back to the case of Rex v. De Berenger, 3 Maule & Selwyn's Reports 67, decided in 1814. In that case De Berenger and seven others were tried on an indictment for a conspiracy to raise the price of the British government funds by circulating the then false report of the death of Napoleon Bonaparte, and predicting that, consequently, peace would soon be concluded between the British king and the people of France, with the purpose of increasing the price of government funds and other government securities on the 21st of February, 1814, and thus injuring any person who should buy funds or securities on that day.

The defendants were convicted, and a motion was made in arrest of judgment. On this motion the case came before the Court of King's Bench en banc, and the judges were unanimous in holding that the defendants were guilty of a conspiracy to defraud.

Lord Ellenborough, the Lord Chief Justice, said at page 72: "I am perfectly clear that there is not any ground for the motion in arrest of judgment. A public mischief is stated as the object of this conspiracy; the conspiracy is by false rumours to raise the price of the public funds and securities; and the crime lies in the act of conspiracy and combination to effect that purpose, and would have been complete although it had not been

pursued to its consequences, or the parties had not been able to carry it into effect. ·The purpose itself is mischievous, it strikes at the price of a vendible commodity, in the market, ʌnd if it gives it a fictitious price, by means of false rumours, it is a fraud levelled against all the public, for it is against all such as may possibly have any thing to do with the funds on that particular day."

Le Blanc, J., said at page 73: "This motion in arrest of judgment is made on three grounds; 1st, that it is not a crime in itself to raise the price of the funds. But we are to look to the indictment in order to see what is the charge; and the charge in the indictment is, that the defendants conspired by false rumours to raise the price of the funds on a particular day. It may be admitted therefore that the raising or lowering the price of the public funds is not per se a crime. A man may have occasion to sell out a large sum, which may have the effect of depressing the price of stocks, or may buy in a large sum, and thereby raise the price on a particular day, and yet he will be guilty of no offence. But if a number of persons conspire by false rumours to raise the funds on a particular day, that is an offence; and the offence is, not in raising the funds simply, but in conspiring by false rumours to raise them on that particular day."

Bayley, J., said at page 75: "If the case admitted of any doubt I should be desirous of further time to consider it; but I have no doubt that there is not any foundation for the objections that have been made. To raise the public funds may be an innocent act, but to conspire to raise them by illegal means, and with a criminal view, is an offence; an offence, perhaps not affecting the public in an equal degree, as it were done with intent to affect the purchases of the commissioners for the redemption of the national debt, which would be affecting the public in its aggregate capacity; but still, if it be completed, it will certainly prejudice a large portion of the king's subjects who have occasion to purchase on that day. And it is not necessary to constitute this an offence that it should be prejudicial to the public in its aggregate capacity, or to all the king's subjects, but it is enough if it be prejudicial to a class of the subjects. Here then is a conspiracy to effect an illegal end and not only so, but to effect it by illegal means, because to raise the funds by false rumours, is by illegal means. And the end is illegal, for it is to create a temporary rise in the funds without any foundation, the necessary consequence of which must be to prejudice all those who become purchasers during the period of that fluctuation."

Dampier, J., said at page 76: "The charge in this indictment is, that the defendants by false rumours conspired to give a temporary rise to the funds of this kingdom, in order to deceive those persons who should purchase into the funds on a particular day. I own I cannot raise a doubt but that this is a complete crime of conspiracy according to any definition of it. The means used are wrong, they are false rumours; the object is wrong, it was to give a false value to a commodity in the public market, which was injurious to those who had to purchase."

In Bedford v. Bagshaw, 4 Hurlstone & Norman's Reports, 537, decided in 1859, the same requirement of fair dealing is found under the decision, though the facts were quite different.

There the defendant had made false representations to the listing committee of the London Stock Exchange in order to procure the stock of the Lake Bathurst Australian Gold Mining Company to be listed. The plaintiff, knowing the rule of the Stock Exchange with regard to the proportion of capital which had to be paid up before listing, bought on the Stock Exchange from third persons 200 shares of the stock. The shares turned out to be valueless. Finding that the representation as to paid-in capital made by the defendant to the listing committee had been false, the plaintiff brought suit against the defendant in an action for deceit and recovered. After the plaintiff had judgment, a rule was entered giving the defendant the right to move for a directed verdict in his favor. The case went to the Exchequer Chamber. Chief Barron Pollock, after the other judges had spoken to the same purport in holding that the rule must be discharged, said at page 548:

"I also think that the rule must be discharged. There was evidence to go to the jury. The defendant acted fraudulently, and made representations to the committee of the Stock Exchange with a view to induce persons to believe the existence of a particular state of things as to these shares. All persons buying shares on the Stock Exchange must be considered as persons to whom it was contemplated that the representation would be made. I am not prepared to lay down, as a general rule, that if a person makes a false representation every one to whom it is repeated, and who acts upon it, may sue him. But it is a different thing where a director of a company procures an artificial and false

value to be given to the shares in the company which he professes to offer to the public. Generally, if a false and fraudulent statement is made with a view to deceive the party who is injured by it, that affords a ground of action. But I think that there must always be this evidence against the person to be charged, viz., that the plaintiff was one of the persons to whom he contemplated that the representation should be made, or a person whom the defendant ought to have been aware he was injuring or might injure. If a director of a company, one of the persons who puts the shares forth, into the world, deliberately adopts a scheme of falsehood and fraud, the effect of which is that parties buy the shares in consequence of the falsehood, I should feel no difficulty in saying that in such case an action is maintainable."

In 1876 the law of the De Berenger Case and of the Bagshaw Case was recognized and approved both by the Court of King's Bench and the Court of Appeal on an indictment for criminal conspiracy in The Queen v. Aspinall, et al., 1 Queen's Bench Division, 730, 2 Queen's Bench Division, 48.

In 1892, there was decided the case of Scott v. Brown, [1892] 2 Queen's Bench Division, 724. In that case there had been an agreement, called a conspiracy by the court, made between several persons to purchase shares in a company in order to induce persons who might subsequently purchase shares to believe, contrary to the fact, that there was a bona fide market for the shares and that the shares were at a real premium. One of the members of this conspiracy sued another member.

The trial judge, Mr. Justice Wright, directed a verdict for the defendant on the ground of lack of evidence, but he said to the jury: "I am not going in this case, either to express any opinion myself, or to ask you to express an opinion, as to what these particular parties did; but as the question has arisen, I do say that if persons, for their own purposes of speculation, create an artificial price in the market by transactions which are not real, but are made at a nominal premium merely for the purpose of inducing the public to take shares, they are guilty of as gross a fraud as has ever been committed, and of a fraud which can be brought home to them in a criminal court."

When the case came to the Court of Appeal the Lord Justices were unanimous in holding that the evidence given by the plaintiff showed a criminal conspiracy, that the court could take judicial notice thereof although the defendant had not pleaded the consequent illegality of the contract on which he was sued, and that Justice Wright, in the court below, should have taken judicial notice of that ground, and not, as he did, merely for lack of evidence.

Lord Justice Lindley said at page 728: "In this case the correspondence put in evidence by the plaintiff in support of the claim he made at the trial shows conclusively that the sole object of the plaintiff in ordering shares to be bought for him at a premium was to impose upon and to deceive the public by leading the public to suppose that there were buyers of such shares at a premium on the Stock Exchange, when in fact there were none but himself. The plaintiff's purchase was an actual purchase, not a sham purchase; that is true, but it is also true that the sole object of the purchase was to cheat and mislead the public. Under these circumstances, the plaintiff must look elsewhere than to a court of justice for such assistance as he may require against the persons he employed to assist him in his fraud, if the claim to such assistance is based on his illegal contract. Any rights which he may have irrespective of his illegal contract will, of course, be recognized and enforced. But his illegal contract confers no rights on him: see Pearce v. Brooks, (Law Reports, 1 Exchequer, 213). The illegal purpose of the plaintiff distinguishes this case from Wetherall v. Jones (3 B. & Ad. 221), and others of a similar kind. I am quite aware that what the plaintiff has done is very commonly done; it is done every day. But this is immaterial. Picking pockets and various forms of cheating are common enough, and are nevertheless illegal. The plaintiff was not entitled to judgment in the Court below, and he has no right to a new trial."

The other two members of the court (Lord Justice Lopes and Lord Justice A. L. Smith) also forcibly condemned the contract as illegal.

Lord Justice Lopes, after describing the contract, cited the case of Rex v. De Berenger, 3 Maule & Selwyn's Reports 67, hereinabove discussed, and remarked at page 730: "Is such a transaction illegal? I am of opinion that it is. It might be made the subject of an indictment for a conspiracy."

Lord Justice A. L. Smith thus dealt with the case in all its implications at pages 733, 734:

"If two or more persons agree to cheat and defraud others by means of deceit and fraud, there can be no doubt that each and

88

all are indictable for a criminal conspiracy at common law. It has been held that it is a criminal conspiracy for two or more to agree by false rumours to endeavor to raise the price of the public funds on a particular day; Rex v. Berenger, 3 M. & S. 67. It has also been held in Reg. v. Aspinall, 1 Q. B. D. 730; 2 Q. B. D. 48, that an agreement by two or more to cheat and defraud by means of false pretences those who might buy shares in a company was an indictable conspiracy. False pretences here do not mean such false pretences as would support an indictment for obtaining money or goods by false pretences. See Reg. v. Hudson, Bell, C. C. 263. Lopes, L. J. has gone fully into the correspondence; but the telegram and letter of December 6, 1890, from the defendant McNab to the plaintiff, the letter of December 7, 1890, from the plaintiff to Slaughter, and of December 8, 1890, from Slaughter to McNab, in my judgment, are sufficient. These documents contain conclusive proof that the plaintiff and McNab agreed together to cheat and defraud those who might buy shares in the company, by leading them to believe that the shares were at a genuine premium in the market, whereas to their knowledge they were not, the fictitious premium being sought to be brought about by means of the purchases to be made with the plaintiff's 632£. 3s. 5d. by McNab, and which were to be made for the sole purpose of creating such fictitious premium. These documents were read by the plaintiff's counsel when he opened his case, as shewing the purposes for which the plaintiff, and the defendant McNab, had agreed that the purchases should be made. The agreement between two or more to do an illegal act has been proved.

"The next question is, Was it shown that the plaintiff and McNab agreed to carry out this intention by illegal means—viz., by deceit and fraud? For, if so, there can be no possible doubt that an indictable conspiracy has been committed—viz., the agreement to do an illegal act by illegal means. It is not necessary in this case to discuss whether the whole of this must be proved to constitute an indictable conspiracy. It is said for the plaintiff that there was nothing deceitful or fraudulent in the fact of his paying his 632£. 3s. 5d. to McNab to purchase shares with upon the open market, and if that had been all I agree; but the question is, Was the payment made as it was for the sole purpose of creating therewith a fictitious premium, in order to induce the public to purchase shares in the company, and thereby benefit the plaintiff and McNab at the expense of the buyer—a

deceitful and fraudulent means whereby to cheat and defraud those who might buy shares in the company?

"I am of opinion that it was.

"Test it in this way. Suppose a purchaser induced to purchase shares of the plaintiff or McNab by means of the fictitious premium created by them solely for the purpose of inducing such purchaser and others to buy, could he or not have successfully sued either or both for a false and fraudulent misrepresentation? I say that he could, and this is another way of stating the same proposition —viz., that the plaintiff and McNab agreed by means of deceit and fraud to cheat and defraud the would be purchasers of shares. The agreement to do an illegal act by illegal means is proved, and for the reasons above both the plaintiff and McNab were liable to be indicted for conspiring to cheat and defraud."

In 1909 a contract of a similar nature was condemned as illegal by the Appellate Division, Second Department, in the case of Ridgely v. Keene, 134 App. Div. 647, 119 N. Y. S. 451. The facts there were that Ridgely had been publishing certain circular letters known as "Ridgely's Financial Forecasts," giving advice to his clients as to the value of securities dealt in on the New York Stock Exchange, and by newspaper advertisements sought subscriptions for this market letter. Defendants were stockbrokers who were interested in a pool in Southern Pacific stock, and wished to create a rising market therefor. Mr. Justice Miller, in writing the opinion, said at page 649 of 134 App. Div., 119 N. Y. S. 451, 453: "One's sense of right and wrong is a safe guide as to what constitutes decent, honorable conduct, and it hardly seems necessary to analyze the transaction in suit, or to quote precedent to show that the plaintiff is seeking to recover the fruits of an illegal and immoral contract. The relation between the plaintiff and his subscribers was one of confidence and trust. He calls them his 'clients,' his 'clientele,' his 'following.' He expected them to act upon his advice in the purchase and sale of stock, and, even had there been no express representations made by him, there would have been an implied obligation on his part not to receive pay from third parties for advising them in a particular way."

Accordingly a judgment for the plaintiff was reversed.

In Ottinger et al. v. Bennett, 203 N. Y. 554, 96 N. E. 1123, decided in 1911, the Court of Appeals in a memorandum opinion re-

versed a decision of the Appellate Division of the First Department, on the dissenting opinion of Mr. Justice Miller, of the Appellate Division, Ottinger v. Bennett, 144 App. Div. 525, 129 N. Y. S. 819.

In that case the defendants, who were directors of the American Ice Company, declared a dividend on the common stock thereof out of capital, in violation of a statute of New Jersey, under which the company was incorporated, and caused the fact of the declaration of such dividend to be published in the newspapers and disseminated among the public, in order to induce the public to purchase shares of the company. In consequence, the plaintiffs purchased 600 shares to their damage. Suit was brought on the basis of defendant's representations as to the financial situation of the company involved in the declaration of the dividends. Mr. Justice Miller and Mr. Justice Dowling dissented from the opinion of the majority of the court, and in the course of his dissenting opinion Mr. Justice Miller referred to the case of Bedford v. Bagshaw, 4 Hurlstone & Norman's Reports 537, with which I have dealt above as being a somewhat analogous case. · He held at page 533 of 144 App. Div., 129 N. Y. S. 819, 825:

"It is familiar law that a fraudulent representation may be effected by conduct, by acts as well as by words, by silence when there is a duty to speak, by half-truths calculated to mislead, or by reckless statements made without knowledge. Vide Nickley v. Thomas, 22 Barb. 652; Viele v. Goss, 49 Barb. 96; March v. First Nat. Bank, 4 Hun, 466, affirmed 64 N. Y. 645; Second Nat. Bank v. Curtiss, 2 App. Div. 508, 37 N. Y. S. 1028, affirmed 153 N. Y. 681, 48 N. E. 1107; Devoe v. Brandt, 53 N. Y. 462; Beardsley v. Duntley, 69 N. Y. 577; Grant v. Walsh, 145 N. Y. 502, 40 N. E. 209, 45 Am. St. Rep. 626; Kountze v. Kennedy, 147 N. Y. 124, 41 N. E. 414, 29 L. R. A. 360, 49 Am. St. Rep. 651. It is equally well settled that the representation need not be made directly to the party injured by it (Brackett v. Griswold, 112 N. Y. 454, 20 N. E. 376), and that one who is induced to enter into a contract by the false representations of a third party may have a right of action against the latter for the wrong (Kujek v. Goldman, 150 N. Y. 176, 44 N. E. 773, 34 L. R. A. 156, 55 Am. St. Rep. 670). The principle of the decisions is that a party is answerable for what he intends to accomplish; that one who intentionally deceives another to his injury, no matter

how, is accountable for the wrong; that a party is liable for misrepresentations, either by conduct or by words, made for another to act upon, if they were calculated to deceive, and if in fact they do deceive such other person into acting in reliance upon them to his injury. It is quite as easy to deceive by acts as by words, and the deed is often more effectual than the word. But the law is not so blind or so absurd as to judge an act by the means regardless of the motive."

In People v. Rice et al., 221 App. Div. 443, 223 N. Y. S. 566 (1927) the Appellate Division for the First Department had to deal with a suit by the Attorney General of New York against George Graham Rice and some of his corporations and associates under the New York statute commonly referred to as the Martin Act (General Business Law N. Y. § 352 et seq. [Consol. Laws N. Y. c. 20]), and in the course of its opinion condemned the use of false representations to the public through a trade paper owned by a corporation controlled by Rice, and also the use of wash sales on the Boston Curb Market to create an illusory impression as to the value of certain mining stock. A decision of the court below, in favor of the defendant, was reversed, and the case remanded for further proceedings.

A federal case in which the question of rigging the market was incidentally involved, and the procedure of such rigging was shown in the record, is In re B. Solomon & Co., 268 F. 108, 115 (C. C. A. 2).

3. It must be remembered, however, that all pools are not necessarily illegal, though most reported cases involving pools are tainted in one way or another by fraudulent practices vis-à-vis the public.

Many of the cases in which the question has been raised came up, as will have been observed, between parties to the pool, and the only case which I have found in which a pool was held to be legal and free of fraud was a case between parties to the pool.

That is the case of Sanderson & Levi v. British Westralian Mines and Shares Corporation, Ltd., and London and Westralian Mines and Finance Agency, Ltd. This case is reported, so far as I can discover, only in the London Times—the decision of the instant court in the Times of November 10, 1898, and the decision on appeal in the Times of July 19, 1899. I find that it is somewhat difficult to get access to these old newspapers, and, consequently, in the hope that it will be a convenience to the bar, I am

annexing the reports of the case as contained in the Times as an appendix hereto.[1]

[1] Trial court's opinion as reported in the Times (London) November 10, 1898:

"Sanderson and Levi v. The British Westralian Mines and Share Corporation (Limited) and The London and Westralian Mines and Finance Agency (Limited).

## "Queen's Bench Division

## "Commercial Court

### "(Before Mr. Justice Mathew)

"The plaintiffs in this case were jobbers on the London Stock Exchange. The defendant companies were worked by a joint board of directors and a joint executive committee. In October, 1897, the defendant companies were large holders of shares in the North Star Gold Mines (Limited). The plaintiffs alleged that they entered into an agreement with one Luning on behalf of the defendant companies to 'make a price' on the Stock Exchange in the shares of the North Star Company, and for that purpose to buy and sell the shares, on the terms that all shares bought by the plaintiffs in excess of those sold by them should be taken up by Luning on behalf of the defendants. The plaintiffs also alleged that a similar agreement was entered into by them on November 5, 1897, with the defendants direct. The plaintiffs dealt in the shares and in the result found themselves 'loaded' with excess shares, some of which were taken up by the defendants, but the balance was refused, and in respect of these shares the plaintiffs claimed £1,908 5s. 3d. The defendants denied entering into the agreements, and further contended that the directors were not authorized to enter into the agreements, that the agreements were ultra vires and were illegal on the ground that the object of the agreements was to induce the public to believe that there was a bona fide market for the shares of the North Star Company and that the shares were at a real premium. The defendants counter claimed for £900, which sum had been paid to the plaintiffs in respect of their dealings in these shares, but the defendants contended that the directors who had drawn the cheque had done so without authority. Evidence was given in support of the plaintiffs' case.

"Mr. Lawson Walton, Q. C., and Mr. Danckwerts appeared for the plaintiffs; Mr. Robson, Q. C., and Mr. Montague Lush for the defendant companies.

"Mr. Justice Mathew, in giving judgment, said that he was of opinion that the transaction must be upheld. It appeared that the defendant companies were shareholders in a company called the North Star Gold Mines (Limited), which had been promoted by them. Nothing disparaging could be said about the company, and there was no reason to suppose that the shares in it were otherwise than of substantial value, but there was a difficulty in getting the public to buy these shares, which it was the interest of the defendants to sell. The course adopted was a matter of everyday occurrence. The first thing was to get all those persons interested in the shares to agree not to flood the market, then a pooling arrangement of the ordinary description was entered into, and the plaintiffs and Luning were employed to carry it through. It was said that this was an illegal agreement, but his Lordship was satisfied that there was nothing in the transaction of an illegal or fraudulent character, nor was it opposed to public policy. There was a total absence of deceit or of anything like improper conduct. Nor could it be said that the agreements were ultra vires. The arrangement was recorded in the minutes of the joint executive committee, and at the meeting of the joint directors that minute was approved. There was, therefore, a formal approval of the transaction by the directors. A sum of £900 had been paid by the defendants in pursuance of the arrangement entered into with the plaintiffs, but afterwards, it was said, doubts arose as to the legality of the transaction and no further payments were made. His Lordship thought, however, that that

The Sanderson & Levi Case is interesting, first, because it was found by all the judges

was not the real reason. The probable explanation was that it was discovered the pooling arrangements could not be carried out, because some of the members of the pool were keeping back their shares and selling them. The plaintiffs were entitled to judgment for the amount claimed, and on the counterclaim, with costs."

Court of Appeal's opinion as reported in the Times (London) July 19, 1899:

### "Supreme Court of Judicature

### "Court of Appeal.

"(Before Lord Justice A. L. Smith, Lord Justice Vaughan Williams, and Lord Justice Romer.)

"Sanderson and Levi v. British Westralian Mines and Share Corporation (Limited) and London and Westralian Mines and Finance Agency (Limited).

"This is an appeal by the defendants from the judgment by Mr. Justice Mathew, reported in The Times of November 10, 1898.

"The action was to recover £1,908 5s. 3d. in respect of shares dealt in by the plaintiffs under an agreement with the defendants. The defendants counterclaimed for £900 paid to the plaintiffs in respect of their dealings in the shares. The learned Judge gave judgment for the plaintiffs for the amount claimed and also on the counter-claim. The facts and questions raised are fully stated in the judgment of Lord Justice A. L. Smith.

"Sir Edward Clarke, Q. C., and Mr. Montague Lush appeared for the defendants; Mr. J. Lawson Walton, Q. C., and Mr. Danckwerts appeared for the plaintiffs.

"The Court took time to consider, and to-day delivered judgment dismissing the appeal.

"Lord Justice A. L. Smith read the following judgment, with which Lord Justice Romer agreed:— This is an action brought by the plaintiffs, who are jobbers upon the London Stock Exchange, against the defendants, who are two companies limited (I will treat them as one), upon an agreement made by the defendants, whereby, in consideration that the plaintiffs would act for them as their jobbers and make a price for and buy and sell at the price so made certain shares of the North Star Gold Mines (Limited), of which shares the defendants were then possessed, the defendants promised to take over and buy from the plaintiffs all shares purchased by them in excess of shares sold by them; and the breach alleged is that the defendants have not performed their part of the contract, whereby the plaintiffs have been damnified to the extent of £1,908 5s. 3d. having purchased shares in excess of those sold. The remarkable part of this case is that the contract, breach, and consequent accruing damage to the plaintiffs are not denied by the defendants, but they set up, first, that the agreement sued on formed part of a fraudulent conspiracy between the directors of the defendant companies and the plaintiffs to cheat and defraud the public, and they assert that they come within, the case of 'Scott v. Brown' (1892, 2 Q. B., 724), decided in this Court in 1892, which they certainly do not, for that was a case of a sham, deceit, and fraud from beginning to end for the purpose of cheating the public. Secondly, that, if this be not established, the agreement is against public policy and cannot be enforced. Thirdly, if both the above defences fail, the agreement is ultra vires of the defendant companies. My brother Mathew, who tried this case, came to the conclusion that fraud there was none, that there was nothing fictitious in it, that the plaintiffs took no steps to mislead the public, and that the agreement was intra vires of the defendant companies, and he accordingly gave judgment for the plaintiffs. The defendants still insist upon their defences and hence the present appeal. In order to understand this case it must be commenced at its beginning and not dealt with in its middle and end, as the case was opened upon appeal. In

that the parties to the pool were wholly free from fraud, and, second, because the principal opinion—indeed the only opinion in the Court of Appeal which is available to us— was written by Lord Justice A. L. Smith, who, as above noted, wrote, seven years before, condemning a fraudulent pool, in the case of Scott v. Brown, [1892] 2 Queen's

---

the month of October, 1897, the defendant companies were possessed of 75,000 shares of the North Star Gold Mines (Limited), which latter company owned a mine in Australia of value yielding as much as one ounce of gold to the ton all through, and my brother Mathew says, and I do not doubt correctly, 'I am satisfied nothing disparaging can be said about the North Star Company or against its property. It was proved by the uncontradicted evidence of Mr. Greening, one of the staff of the official brokers of the Stock Exchange and the publisher of the 'Official List', that upon every account day from the end of February, 1897, which was the first account after the North Star Company had obtained a settlement upon the Stock Exchange, to the end of October, 1897, the account showed that North Star shares (which were £1 shares) were at par, with the exception of the second account when the shares were at ⅞ths, that is 2s. 6d. discount. In the month of October, 1897, the defendant companies were desirous of selling their North Star Company shares, and they had resort to the well-known contrivance of what is called a pool, whereby the control of the market is obtained in this, that the amount of shares to be placed upon the market at any one time can be regulated, and the price at which they are to be so placed is also defined. It is not suggested by the defendants that there is anything illegal in this, so I will pass on. It is proved by the uncontradicted evidence of Mr. Sanderson (one of the plaintiffs), against whose honesty and probity there is not a scrap of evidence (though it is now asserted by the defendants, who are attempting to resist the present action, that he and his partner have entered into a fraudulent conspiracy with them to cheat and defraud the public), that prior to October, 1897, a Mr. Luning, with whom he had had prior dealings, and who was connected with the defendant companies, approached him on the subject of the North Star shares. What then took place was shut out by reason of an objection of the defendants' counsel, but it was proved that subsequently, at Mr. Sanderson's request, he was taken to see the directors of the defendant companies. Mr. Sanderson stated that he insisted upon this in order that he might be satisfied that the mine, in respect of which he and his partner were going to lend their professional reputation, was a thoroughly sound and honest concern: that he had an interview with the directors, when figures and things were discussed, and the directors gave him a satisfactory character of the mine, which confirmed what Mr. Luning had already told him. Mr. Sanderson says:—'On that, subject to our being able to come to terms, I agreed to deal in the shares myself,' that is, to become the defendants' jobber. The price at which the plaintiffs were to start dealing was at 1⅛ to 1¼. Mr. Paddon and Mr. Goodchild (who is a solicitor), directors of the defendant companies, agreed that this was a fair price, and there is no suggestion in the evidence that it was not, in the then state of the Australian market, and it was arranged that this was the price which was to be put through the tape. A further term was imposed by Mr. Sanderson before he and his partner would act for the defendants as their jobbers, which was that, in the event of sellers exceeding buyers, Mr. Luning was to take half the shares which in that event the plaintiffs would be landed with, and this was agreed to. I can see nothing illegal in this agreement between the defendants and the plaintiffs, or the plaintiffs and Luning, still less evidence of a fraudulent conspiracy between the plaintiffs and the defendants to cheat and defraud the public. It turned out that sellers of these shares (for there were many holders of these shares outside the pool) largely predominated over purchasers, and by November 4, 1897, the excess of sales over purchasers amounted to 950

shares. Mr. Sanderson thereupon saw the directors of the defendant companies, and told them of the state of affairs, and that, contrary to what he had been led to believe, there were more sellers than buyers, and he told them 'emphatically many times' that he would cease to make a price for another share unless support was immediately forthcoming from them, and after long conversation it was agreed by the defendants that they would render the support asked. What Mr. Sanderson considered necessary was that the shares offered for sale upon the market by sellers should be taken up, and he suggested that 3,000 shares would effect this. The defendants agreed to provide for this purpose £3,000, and it was also agreed that the plaintiffs should with this £3,000 take up shares as far as that amount would go, and that the shares so taken up should be placed at the disposal of the defendants. It was upon these terms and conditions, and these alone, that the plaintiffs consented to go on dealing for the defendants. The plaintiffs went on acting as jobbers for the defendants, but, in breach of their agreement, upon November 19, 1897, gave notice to the plaintiffs that they would not carry out their bargain, by which date the plaintiffs had sustained the loss as before stated of £1,908. 5s. 3d. by reason of having had to take shares from sellers in excess of that which they had been able to sell to purchasers, and hence the present action. The above is a simple narrative of the facts of this case. The evidence called is all on the side of the plaintiffs, which, as my brother Mathew points out, is treated by the defendants as reliable, for not a single witness was called by them. Where is the fraudulent conspiracy to cheat and defraud between the defendants and the plaintiffs now set up by the defendants, or where is proof of anything done against public policy, or where is there any sham in the case? In the first place I apprehend that a person may sell his property in a market at what price he likes, supposing he does not use fraudulent means to induce others to purchase. If the defendants had employed a broker instead of a jobber to do what the plaintiffs did, that is, to buy from sellers and sell to purchasers, can it be said that anything illegal would have taken place, for may not a man buy up in a market wares which otherwise might compete with his own at a price which he thinks expedient? Surely he may. But it is said that the employment of a jobber and not of a broker to effect this makes all the difference and constitutes the transaction fraudulent and illegal. It is said that upon the Stock Exchange a jobber when asked to make a price, if he does so, is bound either to buy or to sell at the price named as the customer desires, and in this I agree. But how does the fact of one jobber naming his price so stereotype the market of the shares that no other jobber can name another price? Again, how does the fact that the jobber has another person engaged with him (Luning in this case), or has taken an indemnity, show that the jobber is cheating and defrauding the public when he gives the price at which he is willing to either buy or sell? It does nothing of the kind, and I do not believe that a single person purchasing shares upon the Stock Exchange thinks for a moment about the private arrangements of the jobber, or how he makes his profit, or whether he is indemnified or not. This is my belief; but, if it be erroneous, where is the evidence to support the assertion that, if the jobber is assisted by another or is indemnified, it is fraudulent or illegal to make the price he does? On the contrary, the evidence is all one way, and shows that what took place between the plaintiffs and the defendants was absolutely ordinary. Uncontradicted evidence was also given that upon the Stock Exchange particular firms of jobbers deal in the Westralian market, which is called 'a shop' for

Bench Division 724; and in his opinion in the Sanderson & Levi Case distinguished it from the case of Scott v. Brown by saying that the latter was "a case of a sham, deceit and fraud from beginning to end for the purpose of cheating the public."

So we have in these two cases instances wherein a judge of great commercial experience passed on two pools, finding one illegal on account of fraud and the other legal because of a total absence of fraud.

Lord Justice A. L. Smith presided over the Court of Appeal which heard the Sanderson & Levi Case, and had with him two very well-known English judges, Lord Justice Vaughan Williams and Lord Justice Romer.

After reciting all the facts, during the course of his judgment he referred to the situation as an instance of resort to "the well-known contrivance of what is called a pool, whereby the control of the market is obtained in this, that the amount of shares to be placed upon the market at any one time can be regulated, and the price at which they are to be so placed is also defined."

It should be noted that the question of the regularity of this pool was not raised by the defendants. Lord Justice A. L. Smith found that the North Star Gold Mines, Ltd., the company whose shares were dealt in, was in a sound condition and honestly managed, and that the price at which the pool was to sell the shares thereof to support the market was a fair price considering the then current state of the market, and hence that the public could not in fact be cheated or defrauded. The Lord Justice says, after indicating that, because the defendants did not put in any evidence, the facts were practically agreed:

"Where is the fraudulent conspiracy to

cheat and defraud between the defendants and the plaintiffs now set up by the defendants, or where is proof of anything done against public policy, or where is there any sham in the case? In the first place I apprehend that a person may sell his property in a market at what price he likes, supposing he does not use fraudulent means to induce others to purchase. If the defendants had employed a broker instead of a jobber to do what the plaintiffs did, that is, to buy from sellers and sell to purchasers, can it be said that anything illegal would have taken place, for may not a man buy up in a market wares which otherwise might compete with his own at a price which he thinks expedient? Surely he may. But it is said that the employment of a jobber and not of a broker to effect this makes all the difference and constitutes the transaction fraudulent and illegal. It is said that upon the Stock Exchange a jobber when asked to make a price, if he does so, is bound either to buy or to sell at the price named as the customer desires, and in this I agree. But how does the fact of one jobber naming his price so stereotype the market of the shares that no other jobber can name another price? Again, how does the fact that the jobber has another person engaged with him (Luning in this case), or has taken an indemnity, show that the jobber is cheating and defrauding the public when he gives the price at which he is willing to either buy or sell? It does nothing of the kind, and I do not believe that a single person purchasing shares upon the Stock Exchange thinks for a moment about the private arrangements of the jobber, or how he makes his profit, or whether he is indemnified or not. This is my belief; but, if it be erroneous, where is the evidence to support the assertion that, if the jobber is assisted by another or is indemnified, it is fraudulent or illegal to make the price he does? On the contrary, the evidence is all one way, and shows that what took place between the plaintiffs and the defendants was absolutely ordinary. Uncontradicted evidence was also given that upon the Stock Exchange particular firms of jobbers deal in the Westralian market, which is called 'a shop' for the shares, which indicates that there is no need of the intervention of a broker. In my judgment, what a jobber does in making a price is simply that he gives out that at the price he makes he is willing either to buy or to sell, and in the present case in making a price the plaintiffs told the simple truth, for at the prices they made they were in truth and in fact willing either to buy or to sell, and there is, as my brother Mathew says,

the shares, which indicates that there is no need of the intervention of a broker. In my judgment, what a jobber does in making a price is simply that he gives out that at the price he makes he is willing either to buy or to sell, and in the present case in making a price the plaintiffs told the simple truth, for at the prices they made they were in truth and in fact willing either to buy or to sell, and there is, as my brother Mathew says, nothing fictitious about the case and much less fraud.

"Passing the price named through the tape in my opinion is nothing more than that at that price there is a jobber willing to deal either as buyer or seller, and so in the present case there was.

"As to the ultra vires point, I agree with my brother Mathews, and I have nothing to add thereto, and Sir Edward Clarke scarcely, if at all, put the point forward.

"For the reasons given above, in my judgment, this appeal wholly fails, and must be dismissed with costs, both as regards the claim and counter-claim.

"Lord Justice Vaughan Williams read a judgment agreeing in the conclusion arrived at by the other members of the Court."

nothing fictitious about the case and much less fraud. Passing the price named through the tape in my opinion is nothing more than that at that price there is a jobber willing to deal either as buyer or seller, and so in the present case there was."

The other Lords Justices agreed, and the decision of Mathew, J., in the instant court, sustaining the legality of the pool, was therefore affirmed.

4. It seems to me that the teaching of these cases is that, where two or more persons engage in a so-called pool operation on a stock exchange in respect of a stock, it is only by scrupulously maintained honesty of dealing, such as the court found to be the fact in the Sanderson and Levi Case, that they may escape condemnation as a fraudulent conspiracy. The slightest step over the line of absolute fair dealing takes them into a zone of condemnation by the courts, and the doctrine applicable to each member of the pool is the new maxim—caveat venditor.

It is obvious that, when two or more persons, by a joint effort, raise the price of a listed stock artificially, they are creating a kind of price mirage which may lure an outsider into the market to his damage.

In my opinion, such a procedure would of itself constitute a fraud on the public—just as was held in Scott v. Brown, [1892] 2 Queen's Bench Division, 724. A fortiori, when such a procedure is accompanied by active propaganda seeking to interest the public in the shares thus artificially raised in price, it becomes the grossest kind of fraud. That is what I find set forth in the indictment before me.

■■ 5. On a demurrer to, or a motion to quash directed against, an indictment, the allegations of the indictment must pro hac vice be presumed to be true. The indictment accuses the defendants in this case of all the practices which the courts have condemned as a fraud on the public for it is alleged, not only that they manipulated purchases and sales on the New York Stock Exchange for the purpose of raising the price of the stock of the Manhattan Electrical Supply Company for the purpose of disposing of their holdings therein as the price rose, but that they also opened accounts with various brokers by which they operated wash sales, that they paid money to various publicity agents and customers' men to recommend the purchase of the stock, and that they engaged W. J. Goldman & Co., Inc., to circulate market letters to the number of upwards 250,000 to induce the public to become interested in and purchase the stock of the Manhattan Electrical Supply Company by making false and fraudulent representations and statements. Thus a scheme to defraud is obviously set forth.

■ V. The attack on the conspiracy is based on the fact above noted that the conspiracy is alleged to have had its inception on September 1, 1930, and all the overt acts are alleged to have occurred prior to that time.

I hold that the conspiracy count is not invalid by reason of the mistake in the date alleged for the commencement of the conspiracy, for the reason that the conspiracy is not actionable as a crime under United States Criminal Code, § 215, title 18 United States Code, § 338 (18 USCA § 338), unless and until there has been an overt act in furtherance of the conspiracy. For example, if the statute of limitations were involved in this case, it would commence to run from the latest alleged overt act instead of from the time of the alleged beginning of the conspiracy. Cf. Fournier v. United States, 58 F.(2d) 3, 5, 6 (C. C. A. 7); Heskett v. United States, 58 F.(2d) 897, 899 (C. C. A. 9); Rubio v. United States, 22 F.(2d) 766, 767 (C. C. A. 9); Woitte v. United States, 19 F.(2d) 506, 508 (C. C. A. 9); Fisher v. United States, 2 F. (2d) 843, 845, 846 (C. C. A. 4).

This point is well stated with remarkable application to the present case by Judge Evans in Fournier v. United States (C. C. A.) 58 F.(2d) 3, at page 5, where he says:

"Appellant also attacks the indictment because of repugnancy, uncertainty, and duplicity. As a basis for this criticism, he points to the fact that the indictment charged that the scheme to defraud was devised on January 1, 1930, and that the letters sent out in execution of the scheme were mailed in September and October of 1929. Obviously, the indictment set forth the wrong year as the date of the conception of the scheme to defraud.

"This error, however, was not fatal. Hume v. U. S. (C. C. A.) 118 F. 689. The validity of an indictment does not ordinarily depend upon the correctness of a date appearing therein, provided the time alleged does not raise the bar of the statute of limitations. Averments of time are usually matters of form and need not be proved as laid. Moreover, it is not the date the scheme was devised that is important. The mailing of the letters in furtherance of the fraudulent scheme is the fact, the proof of which is essential to the completion of the offense. The date of the mailing of the letters starts the

94

running of the statute of limitations. Munch v. U. S. (C. C. A.) 24 F.(2d) 518."

Munch v. United States, 24 F.(2d) 518, 519 (C. C. A. 5), involved an indictment for use of the mails in connection with a scheme to defraud, but that is the same thing as a conspiracy in its essence, and, just as a conspiracy has to be consummated by the performance of the alleged acts, so the crime of using the mails in connection with a fraudulent scheme has to be consummated by the mailing of a letter in furtherance of that scheme.

It follows from the foregoing that the conspiracy count is not void by reason of the mistake in the dates because the dates of the overt acts control, not only as to the consummation of the crime, but as to the venue of the prosecution thereof. Woitte v. United States, 19 F.(2d) 506, 508 (C. C. A. 9). Cf. also Joplin Mercantile Company v. United States, 236 U. S. 531, 35 S. Ct. 291, 59 L. Ed. 705; Anderson v. United States, 260 F. 557, 560 (C. C. A. 8).

VI. I hold, therefore, that the indictment states a crime and is sufficiently definite to meet the requirements of the criminal law; to enable the defendants to know of what they are accused; and also to raise a plea of res judicata if they are again prosecuted on this same charge.

Settle orders on notice.