Harry A. Bigelow, Trustee in Bankruptcy of Insull, Son & Co., Inc., Appellant, v. Augusta Oglesby, Executrix of the Last Will and Testament of John G. Oglesby, Deceased, Appellee.

### Gen. No. 9,190.

Opinion filed October 19, 1939.

28

ROSENTHAL, HAMILL, ELDRIDGE & KING, of Chicago, for appellant; WILLARD L. KING and NEWELL A. CLAPP, of Chicago, of counsel.

LE FORGEE, SAMUELS & MILLER, of Decatur, and TRAPP & TRAPP, of Lincoln, for appellee; WM. M. RICE, of Decatur, of counsel.

MR. JUSTICE FULTON delivered the opinion of the court.

Harry A. Bigelow, as trustee in bankruptcy of Insull, Son & Co., Inc., instituted this suit at law, based upon a syndicate subscription by John G. Oglesby. The action was originally commenced during the lifetime of Oglesby, and after his death, his executrix was substituted as defendant.

The complaint consists of:

1. A common count for money expended for defendants' use and at his request by Insull, Son & Co., Inc.

2. A common count for money due on an account stated.

3. Two special counts on a contract in writing signed by John G. Oglesby, a copy of which was attached to the complaint.

The contract was a syndicate subscription between (1) Insull, Son & Co., Inc., as syndicate manager (2) The subscribers (of whom John G. Oglesby was one) and (3) Insull Utility Investments, Inc.

It recites that Insull Utility Investments, Inc., is offering for subscription to the holders of its stock 6000,000 shares of its common stock at a price of $50 per share and has requested the syndicate manager to form a syndicate to purchase so many of said shares as shall not be subscribed for by the stockholders. Then follows an agreement by the subscribers to form a syndicate for (1) purchasing so many of the 600,000 shares as shall not be subscribed for by the stockholders, and (2) purchasing in the market shares of the

common stock of the investment company. Then follows the following sentence: ''The subscribers hereto severally subscribe and agree to pay to the Syndicate Manager at its office . . . the amounts set opposite their respective names.'' The amount set opposite John G. Oglesby's name is $50,000.

The agreement then provides that five per cent of each subscription shall be paid as soon as called for by the syndicate manager and the remainder of the subscription ''shall be paid from time to time when and as called for by the Syndicate Manager but only after notice to the subscribers of not less than five days as to each call.''

The contract then provides that the several subscribers shall be called upon to pay their subscriptions only ratably according to the several amounts thereof and that ''in the same proportion, except as otherwise herein provided, each subscriber shall be entitled to share in the benefits and shall bear any loss resulting to the Syndicate under this agreement.''

The contract also provided:

''The Syndicate Manager shall, by notice to the Subscribers, declare this agreement in effect and operative when and not before subscriptions, approved by the Syndicate Manager, for a total of $30,000,000 shall have been made hereunder. Unless $30,000,000 shall have been subscribed for hereunder on or before August 25, 1930, this agreement on that date shall be and become void and of no effect. This agreement shall continue in force and operation until December 15, 1930, but the Syndicate Manager may in its discretion extend the same to a date not later than March 16, 1931, in which event this agreement shall continue in force until such extended date, provided that the Syndicate Manager may in its uncontrolled discretion terminate this agreement at any time before its termination under the foregoing provisions.''

In the tenth clause of the contract it was further provided that the investment company agreed to sell

and the syndicate manager agreed to purchase at the price of $50 per share, such number of 600,000 shares of the common stock of the investment company as may not have been subscribed on or before September 15, 1930, by the persons entitled to subscribe therefor.

Then follow the further provisions of the stock syndicate agreement, including the following:

"The Syndicate Manager agrees to support the market for shares of the Common Stock of the Investments Company and the subscription rights with respect thereto, making use, to the extent required for the purpose, of all the means and resources available to it as Syndicate Manager hereunder, provided that no purchase need be made on the market on behalf of the Syndicate at a price in excess of $57.50 per share for shares of said Common Stock or in excess of $1.50 per right for rights issued to holders of Common Stock or in excess of $.68 per right for rights issued to holders of Preferred Stock, and provided further that the obligation to support the market, as herein expressed, shall terminate upon the termination of this agreement or whenever prior thereto a total of 120,000 shares or the equivalent thereof in rights, shall have been purchased in the market by the Syndicate Manager."

John G. Oglesby filed an answer denying the allegations of the complaint and each paragraph thereof. Later, by leave of court, the defendant withdrew his answer to the third and fourth counts of the complaint and filed a motion to dismiss on the ground that the contract attached to the complaint, "is by its terms contrary to public policy and contrary to the law of the land and is intended to create, foster and continue in force a monopoly and combination in restraint of trade, and is null, void and unenforceable."

The motion was allowed by the court, the entire complaint dismissed and judgment rendered against the appellant. This appeal is from that judgment.

The plaintiff-appellant urges two primary points in seeking a reversal.

1. That the contract was not null, void or unenforceable.

2. It was error for the court, in any event, to dismiss the first two counts of the complaint.

As to the latter point the plaintiff-appellant contends that the two common counts were answered by the defendant-appellee and that the answer was never withdrawn; that, therefore, it was error for the trial court to dismiss the whole complaint, and render judgment against the appellant. However, the record shows that the order allowing appellee's motion to dismiss was entered on September 20, 1938. On November 1, 1938, the appellee filed its motion for judgment and called up the motion for hearing on November 15, 1938. Appellant failed to appear at the hearing and judgment was entered on that date in favor of the appellee, and against the appellant. It is apparent from the pleadings that the appellant in this cause is endeavoring to recover on a special contract, and that such recovery could not be obtained without declaring specifically upon the written agreement. While, the record might be deemed somewhat irregular, the appellant cannot be hurt by the dismissal of the complaint and we are not constrained to reverse this judgment on the technical objection offered in this case.

The appellee contends that the court was entirely warranted in dismissing the complaint because of the failure to allege that the $30,000,000 was subscribed under the syndicate agreement on or before August 25, 1930; that such provision was a condition precedent to the subscribers becoming bound by the agreement and that by failing to allege such fact specifically, the appellant failed to state a cause of action. The defendant's motion to dismiss makes no mention of a failure to allege any condition precedent, but the record shows it was argued before the trial court and expressly ruled upon in favor of the appellant.

Paragraph 3 of Rule 13 of the Supreme Court provides, as follows:

"In pleading the performance of a condition precedent in a contract, it shall be sufficient to allege generally that the party performed all the conditions on his part; if the allegation be denied, the facts must be alleged in connection with such denial showing wherein there was a failure to perform."

In both the third and fourth counts of the complaint it was alleged, "That, on August 25, 1930, the Syndicate Manager duly declared the said Syndicate Agreement to be in effect," and again, "That Insull, Son & Co., Inc., in all things and in all respects duly performed all its obligations and undertakings in the said contract contained to be by it performed." The answer of the appellee does not specifically deny this general allegation.

The appellant also offers in its reply brief to amend the complaint to read, "That Insull, Son & Co., Inc., in all things and in all respects duly performed all its obligations and undertakings and all conditions in the said contract contained to be by it performed." Under such circumstances and believing in the spirit and intention of the legislature as shown by section 4 of the Illinois Practice Act [Ill. Rev. Stat. 1937, ch. 110, par. 128; Jones Ill. Stats. Ann. 104.004] that, "This Act shall be liberally construed, to the end that controversies may be speedily and finally determined according to the substantive rights of the parties, etc., we feel that the position of the appellee on this point is without merit.

It is our view that the main question in controversy, and the one that is controlling in the case is whether or not the syndicate agreement was a contract against public policy and therefore null, void and unenforceable.

The appellant insists that the syndicate agreement upon which this suit is based was the usual and ordi-

nary form used by business men for more than a century where it appeared necessary to stabilize the market upon the issuance of new stock; that the form of such syndicate agreements has become almost as standardized as the form of an insurance policy or a trust deed, and that a decision by the courts which prohibits such feature of stock trading could not fail to cripple and handicap the trade and commerce of the State. On the other hand the appellee, urges that the provisions of the syndicate agreement show that it was executed for the purpose of artificially influencing prices; that its purpose was against the public interest; that it was contrary to public policy and therefore void. While there are many authorities in this jurisdiction and others construing contracts in restraint of trade, and agreements tending to foster a monopoly, there does not seem to be any case which either approves or condemns the particular form of contract used in this case.

The appellee relies chiefly on the case of *Scott v. Brown*, 2 Q. B. D. 724, and on *Harper v. Crenshaw*, 82 F. (2d) 845, in support of its contention that the contract is void.

The appellant depends largely on the English case of *Sanderson & Levi v. British Westralian Mines & Share Corp., Ltd.*, opinion printed in 5 F. Supp. 90, in support of the validity of the agreement.

In the case of *Scott v. Brown, supra,* it was held, that the action was based upon an illegal contract, and could not be maintained, because, the plaintiff brought an action against the defendants who were stockbrokers, through whom he had purchased shares in a projected company to obtain rescission of the contract for the purchase of such shares, and to recover back the purchase money which he had paid in respect of them to the defendants, on the ground that the defendants, while acting as the plaintiff's brokers, had delivered their own shares to him instead of purchasing

them upon the stock exchange. At the trial it appeared from the plaintiff's own case that the money sought to be recovered had been paid by the plaintiff in pursuance of an agreement between him and one of the defendants by which such defendant was, with the money, to purchase upon the stock exchange a number of shares in the projected company at a premium, with the sole object of inducing the public to believe that there was a real market for the shares and that they were at a real premium, which, in fact, as the plaintiff and defendants well knew, they were not. The court further found that an agreement between two or more to purchase shares in a company in order to induce persons who might thereafter purchase shares in such company to believe, contrary to the fact, that there was a bona fide market for its shares, and that the shares were at a real premium is an illegal transaction, and no action can be maintained in respect to such agreement or purchase of shares.

In the case of *Harper v. Crenshaw, supra,* there was a joint undertaking as the basis of the plaintiff's claim, which had as its object the fixing of a fictitious price on the Washington Stock Exchange for the shares of stock in the District National Bank, and to prevent the free and uncontrolled processes of the Stock Exchange whereby the stock might be quoted at a price reflecting the real judgment of the buyers and sellers thereof, as to its true market value. Thereby the public might be misled when dealing with the stock. The court held that a contract having such a purpose is against public policy and unenforceable.

However, the appellant contends that the case of *Sanderson & Levi v. British Westralian Mines & Share Corp., Ltd., supra,* distinguishes the case of *Scott v. Brown, supra,* and that the facts in the later case are more comparable to those of the instant one. In that case the defendants were the owners of a large block of stock of the North Star Company which they wished

to sell to the public. The stock could not be sold upon the market without depressing the market price. The defendants entered into contract with the plaintiffs, who were stock jobbers, "to make a price" upon the stock exchange for the shares of said company. The defendants agreed that they would bear any loss resulting to the plaintiffs if it were necessary, in order to maintain the market price to purchase more stock than was sold. The plaintiffs purchased more stock than they sold in the course of the dealing and sued the defendants on their agreements to pay for the stock. The defendants pleaded the illegality of the contract. The court held that the defense interposed was not sufficient and in commenting said that the course adopted by the parties was one of every day occurrence. The object of the arrangement was to get all those persons interested in the shares to agree not to flood the market. Then a pooling agreement of the ordinary description was entered into and the plaintiffs and one Luning were employed to carry it through. An attempt was made to control the market in that the amount of shares placed upon the market at any one time could be regulated and the price at which they were to be so placed was also defined. Directors of the company agreed that the price fixed was a fair one and the court stated that it could find nothing illegal in the agreement and much less any evidence of a fraudulent conspiracy between the plaintiffs and the defendants to cheat and defraud the public. In distinguishing the case from *Scott v. Brown, supra,* it stated that the latter was a case of sham, deceit and fraud from beginning to end for the purpose of cheating the public.

It is difficult to harmonize all of the decisions and to know just the line of demarkation between a legal and an illegal pool. In the *Sanderson & Levi case,* the brokers were employed to sell the shares of the defendants at a definite figure. It was the method

they adopted for disposing of their holdings without breaking the market. In the case under consideration, the syndicate agreement was entered into for the purpose of stabilizing the market and to fix a value upon the shares of stock which perhaps did not exist. It may have been a method commonly used in the business world but it is hard to see how it can successfully be carried out without deceiving the public as to the actual value of the stock. The price fixed reflected their judgment as to values and might or might not be the true value.

The decisions of our Supreme Court and the courts of this country generally have condemned all contracts tending to corner the market, contracts in restraint of trade, and those which tend artificially to suppress competition and regulate prices to mislead strangers as to market values. We would be slow to approve any contract which tends in any manner to encourage a method of controlling the stock market against public interest. Neither do we wish to unreasonably discourage legitimate business transactions.

Finding, however, no support in the decisions of our courts for a contract such as the syndicate agreement discloses in this case, and believing the trend of American law designates similar contracts as against the public interest, we hold that the judgment of the trial court was correct and its judgment is therefore affirmed.

*Affirmed.*